**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

ROBERT B. REICH, SECRETARY OF
LABOR,
Plaintiff-Appellant,

v.

WALTER W. KING PLUMBING &
HEATING CONTRACTOR, INCORPORATED,
Defendant-Appellee,

and

WALTER W. KING; EVELYN R. KING;

No. 95-2603

WALTER W. KING PLUMBING &
HEATING CONTRACTOR, INCORPORATED
MONEY PURCHASE PENSION PLAN;
WALTER W. KING PLUMBING &
HEATING CONTRACTOR, INCORPORATED
PROFIT SHARING PLAN; WALTER W.
KING PLUMBING & HEATING
CONTRACTOR, INCORPORATED BENEFIT
TRUST; LYNN MARTIN,
Defendants.

Appeal from the United States District Court
for the District of Maryland, at Baltimore.
William N. Nickerson, District Judge.
(CA-92-2116-WN)

Argued: July 10, 1996

Decided: October 11, 1996

Before RUSSELL, WIDENER, and HALL, Circuit Judges.

_____

Affirmed by published opinion. Judge Russell wrote the majority opinion, in which Judge Widener joined. Judge Hall wrote a dissenting opinion.

_____

**COUNSEL**

**ARGUED:** Elizabeth Hopkins, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellant. James Allan Rothschild, ANDERSON, COE & KING, Baltimore, Maryland, for Appellee. **ON BRIEF:** Thomas S. Williamson, Jr., Solicitor of Labor, Allen H. Feldman, Associate Solicitor for Special Appellate and Supreme Court Litigation, Nathaniel I. Spiller, Counsel for Appellate Litigation, UNITED STATES DEPARTMENT OF LABOR, Washington, D.C., for Appellant. E. Scott Conover, ANDERSON, COE & KING, Baltimore, Maryland, for Appellee.

_____

**OPINION**

RUSSELL, Circuit Judge:

The Secretary of Labor (the "Secretary") appeals an award of attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A), arising out of an action brought by the Secretary against Walter W. King Heating and Plumbing Contractor, Inc. ("King Plumbing"), its employees' benefits plans, and the plans' trustees. We affirm the award of attorneys' fees and expenses.

I.

In 1976, King Plumbing established a profit-sharing plan and a pension plan (collectively, the "Plan") for its employees.* Walter W. King and Evelyn King were the trustees of the Plan, and King Plumbing was the Plan's sponsor.

_____

*In 1990, the King Plumbing Profit Sharing Plan and the King Plumbing Money Purchase Plan were merged into one plan, entitled the King Plumbing Benefit Trust.

2

Beginning in 1983, Walter King, who has substantial knowledge and experience in the real estate market in western Maryland, began investing the Plan's assets in residential real estate mortgages, primarily in Frederick County. King reviewed each application for a mortgage loan, met with each borrower personally, and visited each property. He based the interest rate for the mortgage loans on the prevailing rates from local banks. Almost all of the mortgages were short term (five-year balloon) residential mortgages, amortized over 25 years. Most of the mortgages were for less than $100,000, and did not exceed 80% of the value of the property. Between 1985 and 1993, the Plan made approximately 83 mortgage loans, most of them for residential property in Frederick, Maryland.

During the period between June 30, 1984, through June 30, 1993, the Plan averaged better than a ten percent return, grew from $1,513,334 to $4,762,178, paid out benefits in excess of $1.5 million, and never had a return less than 8.67% in any single year. Of the loans made from the Plan's assets, only two defaulted but the Plan recouped the entire amount of principal, interest, and costs in foreclosure proceedings.

Because of the high percentage of assets invested in real estate mortgages, the Secretary began investigating King Plumbing in October 1990. The Secretary concluded that King Plumbing failed to diversify appropriately the assets of its Plan, in violation of § 404(a)(1)(C) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. § 1104(a)(1)(C). It also concluded that King Plumbing had engaged in transactions prohibited by § 406(a)(1) (D) and § 406(b)(1) of ERISA, 29 U.S.C. §§ 1106(a)(1)(D) & (b)(1), by using the Plan's assets to make mortgage loans to individuals who used the loan proceeds to purchase land owned by King Plumbing and to pay King Plumbing to build homes on the land.

On July 29, 1992, the Secretary filed suit against King Plumbing, Walter and Evelyn King, and the Plan itself (collectively, "King Plumbing" or "the defendants"). The Secretary's complaint alleged both that the defendants had engaged in forty-seven prohibited transactions and that the investment of the Plan's assets failed to meet the diversification requirements of ERISA.

3

On December 7, 1993, the defendants deposed James Carroll, the government agent who had investigated King Plumbing. According to Carroll's testimony, he concluded that the Plan's mortgages constituted prohibited transactions because Evelyn King told him that the Plan had made mortgages to individuals who used the proceeds to purchase land owned by King Plumbing and to pay King Plumbing to build homes on the land. Carroll, however, knew that Mrs. King did not have personal knowledge of the nature of the mortgages. Furthermore, he made no review of the mortgage loans and land records to verify that King Plumbing owned the land prior to their being subject to the Plan's mortgages.

In February 1994, the parties settled the prohibited transaction claims. Although King Plumbing did not admit that it had engaged in any prohibited transactions, it agreed not to make loans from the Plan to be used for the purchase of property or services from King Plumbing. In return, the Secretary dismissed the forty-seven prohibited transaction claims against King Plumbing.

On the remaining claim for non-diversification, the district court denied cross-motions for summary judgment, and it held a bench trial on September 26, 1994. Richard Hinz, the Chief Economist and Director in the Office of Research and Economic Analysis for the Pension and Welfare Benefits Administration of the Department of Labor, testified as an expert witness for the Secretary. Hinz concluded that the Plan's lack of diversification was imprudent because the Plan could have achieved the same return with fewer risks by investing in Ginnie and Fannie Mae pooled mortgages. He also testified that the Plan could suffer large losses due to default risk, interest rate risk, inflation risk, and liquidity risk. However, Hinz had not investigated any of the particular loans in the Plan's portfolio, but based his analysis on general economic and investment theories.

The defendants called three expert witnesses: David E. Brock, the president of the Bank of Brunswick in Brunswick, Maryland; Alfred J. Morrison, a private investment management consultant; and William G. Psillas, an employee benefit consultant. Brock provided the best testimony for the defendants. He had analyzed each of the loans in the portfolios and in many cases visited the properties themselves. He concluded that the concentration of the Plan's assets in local resi-

4

dential loans did not create a risk of large losses. He based his opinion on the loans' low loan-to-value ratios, the fact that the loans were 5-year balloon mortgages, the good payment histories of the borrowers, and Walter King's knowledge of the local real estate market. Brock also testified that 60% of his bank's assets are invested in similar mortgage loans in the same geographic area, and that the loans are marketable. Brock also noted that the Plan received an 8.93% return on investments, 0.1% higher than his bank's return.

The district court entered judgment in favor of the defendants on November 17, 1994. Reich v. King, 867 F. Supp. 341 (D. Md. 1994). The district court noted that ERISA required a plan's fiduciary to diversify the plan's investment "unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). The district court held that the defendants had met their heavy burden of proving that their non-diversification was prudent under the circumstances, and that the defendants had offered "convincing and credible evidence that the Plan does not face the risk of large losses due to non-diversification." Id. at 344. The district court found Brock's testimony particularly compelling because, of all the experts, only he had reviewed the particular loans at issue. The court discounted the testimony of Hinz, which it found was based on "textbook type theories that appeared far removed from the actual realities of mortgages in Frederick County." Id. at 345. The Secretary did not appeal the district court's decision.

On November 30, 1994, King Plumbing filed a motion for an award of attorneys' fees and expenses under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). The district court granted the motion on August 3, 1995, and awarded attorneys' fees in the amount of $51,648.00 and expenses in the amount of $3,947.15. The Secretary has appealed the award of attorneys' fees and expenses.

II.

The Equal Access to Justice Act provides:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses . . . unless the court finds that the

> position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). The party seeking fees bears the burden of proving that it was the prevailing party. The government, however, bears the burden of showing that its position was substantially justified. Thompson v. Sullivan, 980 F.2d 280, 281 (4th Cir. 1992). We review the district court's award of attorneys' fees and expenses under an abuse of discretion standard. Pierce v. Underwood, 487 U.S. 552, 557-63 (1988).

A.

We turn first to the district court's decision to award attorneys' fees and expenses on the prohibited transaction claims. In challenging this award, the Secretary argues that King Plumbing was not the prevailing party in the settlement of the prohibited transaction claims, and that the Secretary's position on those claims was substantially justified.

1. Prevailing party

The district court found that King Plumbing was the prevailing party in the settlement of the prohibited transaction claims because it secured the dismissal, with prejudice, of the claims without conceding that it had committed any prohibited transactions. In return, King Plumbing merely agreed not to engage in any future prohibited transactions. In other words, the Secretary dismissed the forty-seven claims against King Plumbing in exchange for its promise to do what it was already legally required to do: adhere to ERISA. The district court stated that "[i]t is difficult to imagine how King Plumbing could have fared any better."

The Secretary claims that it prevailed in the settlement because it gained the right to institute contempt proceedings against King Plumbing if it engaged in prohibited transactions in the future. ERISA, however, has already created a cause of action to remedy prohibited transactions. The power to bring a contempt action merely duplicates the ERISA cause of action and does nothing to improve the

6

Secretary's ability to enforce ERISA. Neither remedy is effective unless the Secretary can prove that King Plumbing actually engaged in prohibited transactions, which the Secretary could not do with respect to any of the forty-seven transactions identified in the complaint.

We conclude that the district court did not abuse its discretion in finding King Plumbing to be the prevailing party in the settlement.

2. Substantial justification

The district court found that the Secretary's position on the prohibited transaction claims was not substantially justified because the Secretary based his charges on a single, unverified statement made by Evelyn King. Evelyn King told a government investigator that King Plumbing had made mortgage loans from the Plan to individuals who then used the proceeds to purchase land owned by King Plumbing and to pay King Plumbing to build homes on the land. Although the investigator knew that Mrs. King did not have personal knowledge of the nature of the mortgages, but merely processed the loan payments and handled the bookkeeping, the investigator made no examination of the mortgage loans. The Secretary agreed to settle the prohibited transaction claims after the investigator revealed during his deposition that Mrs. King's statement constituted the entire basis of the Secretary's claims.

The government insists that Mrs. King's statement is extremely strong evidence of an ERISA violation because she was a trustee of the Plan. We disagree. Although Mrs. King had the title of trustee, the government investigator knew that Mr. King made all of the financial decisions and that Mrs. King performed only ministerial functions. The investigator should have verified Mrs. King's statement by examining the individual mortgage loans. The district court did not abuse its discretion in concluding that the Secretary should have conducted a more thorough investigation before bringing prohibited transaction charges against King Plumbing.

The Secretary also contends that the evidence it gathered during discovery specifically identified two loans as constituting prohibited transactions. Even if the government did find evidence supporting two

7

prohibited transactions, it does not provide a compelling reason to alter the district court's judgment. The Secretary brought sweeping charges against King Plumbing, alleging that it had engaged in forty-seven prohibited transactions. After discovery, the Secretary found no evidence to support the charges with respect to forty-five of the forty-seven transactions. The Secretary did not amend its complaint to limit its prohibited transaction claims to the two mortgage loans on which it found evidence of impropriety. The Secretary admitted that it did not amend its complaint because it was in the middle of settlement negotiations with King Plumbing and it did not want to weaken its bargaining position. Even so, the Secretary entered a settlement agreement in which King Plumbing did not admit to having engaged in any prohibited transaction. Whatever evidence the Secretary found to support its prohibited transaction claims, we conclude that the district court did not abuse its discretion in discounting it.

The Secretary also contends that Walter King admitted at trial that he had engaged in one prohibited transaction. The gist of King's testimony, however, was that he took money out of the Plan in 1983 to finance a construction job, learned that such an action was prohibited, and did not do it again. The Secretary's prohibited transaction charges are based on transactions that occurred between 1985 and 1990. Thus, King's admission bears no relation to the mortgage loans that form the basis of the Secretary's prohibited transaction claims.

We conclude that the district court did not abuse its discretion in finding that the Secretary's position on the prohibited transaction claims was not substantially justified.

B.

We next turn to the district court's decision to award attorneys' fees and expenses on the lack of diversification claim. Because it is clear that King Plumbing was the prevailing party on this claim, the Secretary argues only that its position was substantially justified.

ERISA requires a plan's fiduciary to diversify the plan's investments "unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C). The district court found that the Secretary adopted the position that the King Plumbing's lack of diversifi-

8

cation was a per se violation of ERISA because of the inherent risks in mortgage loans. The district court held that the Secretary's position was not substantially justified because he made no inquiry into the specific facts and circumstances surrounding the Plan's investments.

The Secretary contends that the district court has mischaracterized its position. He argues that he did not take the position that the failure to diversify real estate investments was a per se violation of ERISA. Instead, he maintains that he considered the specific circumstances surrounding the Plan's investments and concluded that the concentration of assets in real estate mortgages in a single geographical area exposed the Plan to the risk of large losses. Specifically, the Secretary identified the following risks: the risk that a significant downturn in the local economy could lead to widespread unemployment resulting in borrower defaults and loss of property values (default risk); the risk that a general rise in the interest rate would devalue the investments or that a decline in interest rates would lead to widespread prepayment by borrowers (interest rate risk); the risk that an increase in inflation would devalue the investments and decrease their marketability (inflation risk); and the risk that a sudden, unexpected demand for benefit payments by the beneficiaries would result in losses from the inability to sell the mortgages at face value (liquidity risk).

The Secretary, however, did not identify any specific reasons suggesting the likelihood of a significant downturn in the local economy, a sudden change in interest rates, a drastic increase in inflation, or an unexpected demand for benefit payments by the beneficiaries. The Secretary did not examine any of the particular mortgages in the portfolio to determine the risk of the Plan's investments. Hinz, the Secretary's expert, relied on general assumptions to reach the general conclusion that it is always imprudent to concentrate assets in real estate mortgages in a single geographical area. Neither the Secretary nor his expert examined the specific circumstances surrounding the Plan's investments to determine whether King Plumbing's lack of diversification was imprudent.

We conclude that the district court did not abuse its discretion in finding that the Secretary's position on the diversification claim was not substantially justified.

9

III.

For the foregoing reasons, we affirm the district court's award of attorneys' fees and expenses.

AFFIRMED

HALL, Circuit Judge, dissenting:

The district court abused its discretion in ruling that King was the prevailing party on the prohibited-transactions claims and that the Secretary's position with regard to the diversification claims was not substantially justified. I would, therefore, reverse the district court's order granting attorney's fees to King.

I.

The district court ruled, and the majority agrees, that the dismissal with prejudice of the prohibited-transactions claims, in return for nothing more than King's "promise to do what it was already legally required to do: adhere to ERISA," is enough to confer prevailing party status on King because King "`could [not] have fared any better.'" Ante at 6. This conclusion, however, is premised on an erroneous view of how the consent order affects the parties' future legal relationship.[1]

A.

King, as the party moving for EAJA fees, had the burden of demonstrating that it had prevailed. In order to be seen as the prevailing party with regard to the prohibited-transactions claims, King had to show that the settlement "materially altered" the legal relationship of the parties and that the settlement, on balance, favored King. See Roanoke River Basin Ass'n v. Hudson, 991 F.2d 132, 139 (4th Cir.), cert. denied, 510 U.S. 864 (1993). Although we apply an abuse of dis-

_____

[1] The majority asserts that the Secretary could not prove that King "actually engaged in prohibited transactions . . . with respect to any of the forty-seven transactions identified in the complaint." Ante at 7. The district court, however, never made such a finding.

10

cretion standard to the district court's "prevailing party" determination, we review any predicate legal rulings de novo. See United States v. 2116 Boxes of Boned Beef, 726 F.2d 1481, 1486 (10th Cir.), cert. denied, 469 U.S. 825 (1984).

The analysis should begin with an examination of what result each party hoped to achieve. In his complaint, the Secretary claimed that the Kings, in their roles as fiduciaries of the pension plans, had violated 29 U.S.C. § 1106(a)(1)(D) & (b)(1) by making mortgage loans with plan assets to individuals who intended in turn to use the loans to finance the construction of homes by the construction company owned by the Kings. The relief requested was restoration to the plan of any losses resulting from such violations (although the complaint did not allege that losses had occurred). The Secretary also asked the court to enjoin King "from violating ERISA [and] from lending plan assets to customers of King Plumbing." From King's perspective as defendant, the best possible outcome would have been dismissal of the claims with prejudice, the quicker the better.

Had prohibited transactions been established, either through fact-finding by the court or admission by King, 29 U.S.C.A. § 1109(a) (West 1985) would have provided the following options to the court: (1) make the responsible fiduciary personally liable for losses to the plan, and (2) "such other equitable or remedial relief as the court may deem appropriate, including removal of the fiduciary."[2] Option # 1 was meaningless once the Secretary determined that there were no losses from any of the loans made with plan assets. [3] Loss to the plan, however, is not an element of the prohibited-transactions claims.

_____

[2] Under a general civil enforcement provision, 29 U.S.C.A. § 1132(a)(5) (West Supp. 1996), the Secretary may seek "to enjoin any act or practice which violates any provision of[Subchapter I, which includes § 1106(a)] or [ ] to obtain other appropriate equitable relief (i) to redress such violation or (ii) to enforce any provision of [Subchapter I.]"

[3] It apparently came to light during the discovery phase of the litigation that the Kings were also engaging in or had engaged in another type of prohibited transaction by which the Kings would attempt to meet ERISA's minimum funding obligations with non-cash contributions to the plan. See Secretary of Labor's Opposition to Defendant King Plumb-

Option # 2, then, was the only source of relief. See Brock v. Robbins, 830 F.2d 640, 647 (7th Cir. 1987) (injunctive relief appropriate despite lack of losses to plan). From the Secretary's perspective, the settlement -- an agreement by King to not violate the prohibited-transactions statutes in the future[4] -- embodies the fullest measure of available relief. Most settlements involve some give and take, and the Secretary's insistence on a concession of wrongdoing by King (if in fact there had been any wrongdoing) would have served no practical purpose. Under such circumstances, the Secretary would have been derelict to insist on a trial when he could get all he wanted in a settlement.

B.

Under the settlement, the district court retained jurisdiction "for the purpose of enforcing the terms of this Consent Order." To say that King "could not have fared better" ignores the significant differences between seeking enforcement of an existing order and starting from scratch with a new complaint. Should he come to believe that King is engaged in violations of the terms of the settlement, the Secretary need only move to enforce the order. Whether any of the 47 violations alleged in the original complaint ever occurred would be immaterial; the only question for the court would be whether the new violations had been shown.

More significantly, the available relief would be expanded. Fines for civil and criminal contempt might be awarded against the contemnor. See United States v. United Mine Workers of America, 330 U.S. 258, 302-04 (1947). An award of costs and attorney's fees to the Sec-

_____

ing's Motion for Award of Attorneys' Fees and other Expenses, (Exhibit D - Jan. 4, 1994, letter from Secretary's counsel discussing non-cash contributions). Such contributions are violative of 26 U.S.C. § 4975(c)(1)(A). See C.I.R. v. Keystone Consol. Industries, Inc., 508 U.S. 152 (1993). Although the complaint was not amended to add such a claim, the consent order includes King's agreement not to make or receive such non-cash contributions in the future.

[4] The requested removal of the fiduciary related only to the diversification claims.

12

retary, not available under EAJA or ERISA in the context of an original enforcement action under 29 U.S.C.A. § 1109(a), could be granted under the court's inherent power to enforce its orders. See In Re General Motors Corp., 61 F.3d 256, 259 (4th Cir. 1995). Moreover, an action to enforce an existing order would presumably proceed more expeditiously relative to an enforcement action initiated by complaint. A contempt action does not, as the majority asserts,"merely duplicate[ ]" an original enforcement action. Ante at 6.

We all have the duty to obey the law. When the Kings signed the agreement, however, violation of §§ 29 U.S.C.§ 1106(a)(1)(D) & (b)(1) became virtually synonymous with contempt of the court, and the price of disobedience rose considerably. The district court erred in discounting the effect of the consent order. This error, which was the cornerstone of its decision, leads me to conclude that the court abused its discretion in according prevailing party status to King.

II.

Of course, King prevailed on the diversification claims, but that takes care of only the threshold requirement for EAJA fees. To recover fees, King had to also prove that the claims were not "substantially justified" and did not have "a reasonable basis both in law and in fact." Pierce v. Underwood, 487 U.S. 552, 562 (1988). The government's action need only be "justified to a degree that could satisfy a reasonable person." Id. at 565. Review of the relevant criteria -- the stage of the proceedings at which the merits were decided, the views of other courts on the diversification issue, the merits of the case against King -- leads me to conclude that the district court abused its discretion in finding no substantial justification for the Secretary's position.

The Secretary succeeded in making out a prima facie case of non-diversification and, in so doing, he forced King to shoulder the heavy burden of proving that it was "clearly prudent" not to diversify. 29 U.S.C.A. § 1104(1)(C) (West Supp. 1996). When as much as 77% of a plan's assets are in mortgages, and 72% of those in a single county, the statutory requirement of diversification is clearly not being fulfilled under any reasonable interpretation of the statute. Indeed, as the district court noted, even the Kings conceded that they had not met

13

the diversification requirements of § 1104. <u>Reich v. King</u>, CA No. WN-92-2116 at 7 (D. Md.) (Aug. 17, 1994, Memorandum denying cross-motions for summary judgment). In short, the case was a close one.

Although no two diversification cases are the same, the Secretary was able to cite numerous decisions in which courts had found violations flowing from concentrations of investments similar to those under the King plan. <u>See</u>, <u>e.g.</u>, <u>Donovan v. Guaranty National Bank</u>, 4 Emp. Benefits Cas. (BNA) 1686 (S.D. W. Va. 1983). King made no comparable showing.

Unrebutted evidence demonstrated that ultra-safe investments in government-insured mortgages would have brought comparable returns without the associated risk. Nevertheless, the majority approves of the district court's ruling that the Secretary's evidence was inadequate because the government expert failed to examine the particular mortgages in the plan's portfolio and failed to "identify any specific reasons suggesting the likelihood" of any dangers that diversification is designed to avoid. <u>Ante</u> at 9. But sharp increases in inflation or interest rates and precipitous downturns in local economies cannot often be predicted with any degree of accuracy, and that very uncertainty is the reason ERISA requires that diversification be practiced so that the risk of large losses can be minimized. This remained a close case on the merits throughout.

I have no doubt that Mr. King is an intelligent and conscientious student of the local mortgage market; his success to date bears that out. However, the Secretary is statutorily authorized to bring enforcement actions to ensure the prudent operation of pension plans, and diversification is a specific requirement of plan-asset management. The majority opinion will no doubt dampen the Secretary's willingness to pursue other plans where the assets are similarly concentrated. In the long run, the losers will be the beneficiaries of the plans. EAJA was intended to thwart government abuses, not to "chill the government's right to litigate or to subject the public fisc to added risk of loss when the government chooses to litigate reasonably substantiated positions, whether or not the position later turns out to be wrong."

14

<u>Roanoke River Basin Ass'n</u>, 991 F.2d at 139. The purposes of EAJA are disserved by this fee award.

I respectfully dissent.

15