**Robert B. REICH, Secretary of Labor**

**v.**

**Walter W. KING, et al.**

**Civ. A. No. WN–92–2116.**

United States District Court, D. Maryland.

Nov. 17, 1994.

Lawrence Brewster, and U.S. Dept. of Labor, Washington DC, for Secretary of Labor.

James A. Rothschild, and Anderson, Coe & King, Baltimore, MD, and William Sauser, and Sauser & Blair, Jefferson, MD, for defendants, Walter W. King, Evelyn R. King, Walter W. King Plumbing & Heating Contractor, Inc., Walter W. King Plumbing & Heating Contractor, Inc. Money Purchase Pension Plan, Walter W. King Plumbing & Heating Contractor Inc. Profit Sharing Plan, Walter W. King Plumbing & Heating Contractor, Inc. Benefit Trust.

Jeanette Plante, and U.S. Attorney's Office, Baltimore, MD, and Elliot D. Raff, and Office of Sol., Washington DC, for counter defendant, Lynn Martin.

### MEMORANDUM

NICKERSON, District Judge.

Beginning on September 26, 1994, the Court heard three days of testimony and argument concerning this action brought against Defendant by the Secretary of Labor. Upon a review of the evidence and applicable case law, the Court rules in favor of the Defendant. Pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, findings of fact and conclusions of law are set forth below.

*I. BACKGROUND*

The Secretary of Labor has brought this action under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132(a)(2) and (5), as amended,[1] against Walter W. King Plumbing & Heating Contractor, Inc. ("King Plumbing"); the King Plumbing Money Purchase Plan, the King Plumbing Profit Sharing Plan, and the King Plumbing Benefit Trust (collectively "the Plan"); and Walter W. and Evelyn R. King as trustees of the plans (collectively, "the Kings"). The original complaint alleged that the Kings had invested a disproportionate percentage of plan assets in residential mortgages, and that the mortgages were made to the Kings' customers, who then allegedly used the proceeds to buy land and services from the Kings. The Secretary claimed that these activities were in violation of ERISA in that they constituted self-dealing, failure to diversify, and violation of the fiduciary obligation. Defendants answered the complaint and filed two counterclaims.

Before trial, by order or stipulation, all claims but one were either dismissed or withdrawn. The only issue remaining is whether the Kings' activities violated ERISA's diversification requirement.

The essential facts of this case are as follows. In 1976, King Plumbing established a profit-sharing plan and pension plan for its employees, known as the Profit Sharing Plan and Money Purchase Plan. Walter and Evelyn King were trustees of the Plan, and King Plumbing was the Plan's sponsor. In 1990, the Profit Sharing Plan and the Money Purchase Plan were merged into one Plan, the Benefit Trust. In the early 1980's, Walter King, who has substantial knowledge and experience in the real estate market in western Maryland, began investing the Plan's assets in residential real estate mortgages, primarily in Frederick County. King personally met with each borrower, reviewed each application, and visited each property. King patterned his interest rates after those

---

1. 29 U.S.C. § 1132 provides that the Secretary may bring a civil action seeking equitable relief for alleged breach of fiduciary duty. All citations to ERISA will be made to the corresponding provision in Title 29 of the United States Code.

charged by local banks. The loans typically had a loan to value ratio of 80% or less.

The number of assets invested in mortgages increased gradually, peaking in 1990 at 77%. In total, the number of mortgages hovered around 30 and most were for $100,000, or less. All of the mortgages were secured by residential real estate. Seventy-two percent, which equals 70% of all the Plan's investments, are secured by real estate located in Frederick County.

The Plan's loans are unique in that the vast majority are 5 year "balloon loans" amortized over 30 years. Testimony elicited at trial explained that the loans had to be paid off (refinanced through another lender), or renewed after 5 years. This arrangement is significant because it allowed the Plan to confine its exposure to certain risks (e.g., interest rate fluctuation) to the initial 5 year period. Of the 83 loans made from 1985 to the end of 1993, only 2 defaulted and required foreclosure proceedings. Even so, the Plan did not suffer any losses as a result of those 2 foreclosures. The average rate of return for all the Plan's mortgage loans is 8.93%.

In 1990, the Department of Labor targeted the King Plan as having more than 53% of its assets invested in real estate mortgages in 1987. The Department of Labor then opened an investigation of the Plan in October 1990. As a result of the investigation, the Secretary brought this civil action in July 1992.

## II. DISCUSSION

The relevant ERISA provision requires a fiduciary to: "[diversify a plan's investments] so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so." 29 U.S.C. § 1104(a)(1)(C).[2]

■ In cases brought by the Secretary under § 1104(a)(1)(C), the initial burden is on the Secretary to show a violation of the diversification requirement. If the Secretary is successful in meeting that burden, then Defendants must demonstrate that their actions were "clearly prudent." See H.R.Rep. No. 1280, 93d Cong., 2d Sess. 304, reprinted in 1974 U.S.Code Cong. & Admin.News (Vol. 3) 4639, 5038, 5084 ("Joint Explanatory Statement of the Committee of Conference"); Lanka v. O'Higgins, 810 F.Supp. 379, 386–87 (N.D.N.Y.1992). In this case, Defendants concede that by concentrating in upwards of 70% of the Plan's assets in real estate mortgages, they have not met § 1104's diversification requirement. Thus, Defendants bear the "heavy burden" of showing that their decision not to diversify was clearly prudent. Marshall v. Glass/Metal Ass'n. and Glaziers and Glassworkers Pension Plan, 507 F.Supp. 378, 384 (D.Haw.1980).

■ A fiduciary's subjective, good faith belief in his prudence will not insulate him from liability. Rather,

> the prudent person standard has been determined by the courts to be an objective standard, requiring the fiduciary to (1) employ proper methods to investigate, evaluate and structure the investment; (2) act in a manner as would others who have a capacity and familiarity with such matters; and (3) exercise independent judgment when making investment decisions.

Lanka, 810 F.Supp. at 387.

Thus, the Kings' decision not to diversify must be measured by an objective standard—that of a prudent investor similarly situated.

■ Both parties put forth substantial expert testimony comparing the King Plan's investment portfolio to others in the industry. Richard Hinz, the Chief Economist and Director in the Office of Research and Economic Analysis for the Pension and Welfare Benefits Administration of the Department

---

2. The 1974 Conference Report on ERISA explains that the reason for the diversification requirement of § 1104(a)(1)(C) is to eliminate the risk of large losses.

> A fiduciary usually should not invest the whole or an unreasonably large proportion of the trust property in one type of security or in various types of securities dependent upon the success of one enterprise or upon conditions in one locality, since the effect is to increase the risk of large losses.

H.R.Rep. No. 1280, 93d Cong., 2d Sess. 304, reprinted in 1974 U.S.Code Cong. & Admin.News, 5038, 5085.

of Labor testified for the Secretary. In summary, Hinz was of the opinion that the Plan's lack of diversification was imprudent. Hinz conclusion was based on the premise that the Plan's returns could have been realized with a more diversified portfolio facing fewer risks, and that the Plan was not compensated for the significant risks that it faced. Hinz testified that the Plan could suffer large losses due to the following risks: default risk, interest rate risk, inflation risk, and liquidity risk.[3] On cross-examination Hinz stated, however, that he had not investigated any of the particular loans in the Plan's portfolio. Rather, his analysis was based on general economic and investment theories. In addition, Hinz admitted that he had never managed an investment portfolio, and that his only experience with residential mortgages resulted from the purchase of his own home.

Defendants put forth the opinions of three experts: David E. Brock, president of the Bank of Brunswick, which does business in the area where the Plan's investments are based; Alfred J. Morrison, a private investment management consultant; and William G. Psillas, an employee benefit consultant.

Mr. Brock analyzed each of the loans in the Plan's portfolio. In many instances Brock personally visited the properties that served as collateral for the loans. Brock concluded that there is no risk of large losses due to the Plan's heavy concentration in residential mortgages, and that the loans were made in a prudent manner. Brock based his opinion on the loans' low loan to value ratios, their status as 5 year "balloons," the good payment histories of the borrowers, and Walter King's knowledge of the local real estate market. Brock further stated that at least 60% of his bank's assets are invested in similar mortgage loans in the same geographic area as the Plan's, and that the Plan's loans are marketable.[4]

Morrison testified that, in general, mortgage-backed investments are a relatively low-risk form of investment. He based his opinion on nationwide data that included a wide array of mortgage investments, including pooled mortgages such as Ginnie and Fannie Maes. The Secretary correctly noted, however, that the residential mortgages in this case form only a small subset of the data group that Morrison relied on; thus, whether residential mortgages enjoy the same low-risk as mortgages in general, could not be determined to a "statistical certainty."

Psillas' offered a statistical comparison of the Plan's returns to the returns of 31 companies that his firm advises. The 31 companies' assets ranged from $250,000 to $10 million (the Plan's assets are around $5,000,000). Psillas testified that from 1984 to 1992, the Plan's average annual returns were better than the returns of the companies in his data base. On cross-examination Psillas acknowledged, however, that his comparison was "statistically invalid" given the small number of plans in his sampling.

This Court concludes from the evidence presented, concerning the time frame encompassed by the complaint, that the Kings have carried their burden of showing that the Plan's lack of diversification was clearly prudent and hence not violative of 29 U.S.C. § 1104(a)(1)(C).[5] The Kings offered convincing and credible evidence that the Plan does not face the risk of large losses due to nondiversification. The fact that the loans were

---

3. In *Citizens Bank of Clovis,* the court recognized that three of these risks are associated with mortgages and explained:

> Default risk is the risk that payments will not be made timely or that it will be necessary to foreclose on the mortgaged property for repayment of the loan.... Spread or interest rate risk is the risk that the lender's cost of funds will approach or exceed the interest rate charged to the borrower.... Finally, inflation or purchasing power risk is that the expected real rate of return on a mortgage will not be realized because of unanticipated inflation."

*Brock v. Citizens Bank of Clovis,* No. 83–1054 BB, 1985 WL 71535 (D.N.M. Dec. 20, 1985), *aff'd,* 841 F.2d 344 (10th Cir.1988).

The last risk, liquidity risk, simply refers to the risk that there is no secondary market for the Plan's mortgages and losses could result if the Plan were suddenly forced to sell the loans at below face value.

4. Indeed, Brock stated that his bank had already agreed to purchase several of the Plan's loans.

5. The Court offers no opinion as to whether continuing to follow the Plan's current investment strategy would be prudent.

short term (5 year "balloons"), as well as the testimony of David Brock were particularly compelling in regard to the conclusion reached. Mr. Brock was the only expert that analyzed each of the particular loans at issue, and given his extensive experience in making residential mortgages in Frederick County, his testimony was given considerable weight.[6] On the other hand, the Secretary's expert based his opinions on textbook type theories that appeared far removed from the actual realities of mortgages in Frederick County. In this regard, the Secretary simply failed to put forth sufficiently credible proof to refute the King's substantial presentation that the Plan's investments were clearly prudent.

## V. CONCLUSION

For the reasons stated above, the Court determines that the Defendant has carried his burden of showing that the Plan's investments, though not diversified, were otherwise clearly prudent. Therefore, the Plaintiff's claims against the Defendant are dismissed in their entirety.

---

6. The Court acknowledges that crediting testimony regarding the risks of each particular mortgage may be inconsistent with language set forth in an earlier opinion in this same action. *See* *Reich v. King*, 861 F.Supp. 379, 384 n. 3 (D.Md. 1994). To the extent that the former opinion contradicts anything in this opinion, it is reversed.