United States Court of Appeals,

Fifth Circuit.

No. 95-11129.

Cynthia A. METZLER, Secretary of the United States Department of
Labor, Plaintiff-Appellant,

v.

Jack V. GRAHAM, Defendant-Appellee.

May 13, 1997.

Appeal from the United States District Court for the Northern
District of Texas.

Before JOLLY, JONES and PARKER, Circuit Judges.

EDITH H. JONES, Circuit Judge:

The Secretary of the United States Department of Labor alleges
that Jack V. Graham violated his fiduciary duties under the
Employee Retirement Income Security Act ("ERISA") as plan
administrator of the Graham Associates, Inc. ("GAI") pension plan
by failing to diversify the plan investments and by self-dealing.
Specifically, the Secretary complains that Graham failed to
diversify the plan assets by investing 63% of them in a single
tract of undeveloped real estate, and he sacrificed the plan's best
interests by buying land near other parcels in which he owned an
interest. We agree with the district court's conclusion that under
the circumstances before us, Graham did not violate 29 U.S.C. §
1104(a)(1)(A) and (C), and we therefore affirm.

I. Background

Graham is the president and sole owner of GAI. He also serves
as the sole trustee and administrator of a defined contribution

1

benefit plan established in 1975 to provide retirement, death and disability benefits to the employees of GAI. At the end of 1984, the plan had 123 participants and $2,740,735 in assets. Graham owned approximately 20% of the plan assets.

Before 1985, Graham invested the plan assets in a mixture of short-term certificates of deposit in denominations of less than $100,000, short-term U.S. Treasury Securities, cash and cash equivalents.

In April 1985, Graham paid $1,743,011 ($1.65 per square foot) on behalf of the plan for 24.251 acres of undeveloped land (the "Property") in the Great Southwest Industrial District in Grand Prairie, Texas, a suburb of Dallas. The Property is zoned for light industrial use. GAI had done civil engineering work on the property for the prior owners. Graham personally owned an interest in two parcels adjacent to the property and in another parcel nearby.[1] The investment in the Property represented 63% of the plan assets. The remaining 37% was invested as before.

At the time of the purchase, Graham obtained an independent appraisal valuing the Property at $2,154,000 ($2.00 per square foot). At the end of 1985, an independent appraiser valued the property at $2,900,000 ($2.75 per square foot). Graham envisioned selling the Property within a short period of time, but this did

---

[1]The two adjacent parcels are the Westfork Tract, a 174 acre tract, and the ESO Tract, an 11 acre tract. The Westfork Tract was owned by the Westfork Partnership in which Mr. Graham had a 33% interest. The ESO Tract was owned by the ESO Partnership in which Mr. Graham had a 95% interest. The 360 North Joint Venture Tract was another nearby tract in which Mr. Graham owned a 33% interest.

not transpire.  Instead, since acquiring the Property, the plan has paid maintenance and taxes but has earned no income from it.  The court found, however, that the Property has at least maintained its value and that no plan participants had lost benefits as a result of the purchase.[2]

The Secretary brought this suit under Sections 502(a)(2) and (5) of ERISA.  29 U.S.C. § 1132(a)(2) and (5).  The Secretary alleged that the investment of 63% of the plan's assets in one piece of real estate violated Graham's duty to diversify plan assets.  The Secretary also alleged that Graham violated his duty of loyalty by purchasing the land without taking precautions to ensure the purchase was in the best interests of the plan beneficiaries.  After a bench trial, the district court entered findings of fact and concluded that Graham did not violate his duty to diversify or his duty of loyalty.  The Secretary now appeals.

## II. Duty to Diversify.

ERISA requires a plan fiduciary to

> discharge his duties with respect to a Plan solely in the interest of the participants and beneficiaries ... by diversifying the investments of the Plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.

29 U.S.C. § 1104(a)(1)(C). No statute or regulation specifies what constitutes "diversifying" plan investments, but the legislative history provides this guidance:

---

[2]The Secretary's expert testified that, as of the time of trial, the Property was appraised at $1,835,000, an amount that exceeded the purchase price.  Graham's expert testified that, as of the time of trial, the Property was worth $3,275,000.

> The degree of investment concentration that would violate this requirement to diversify cannot be stated as a fixed percentage, because a fiduciary must consider the facts and circumstances of each case. The factors to be considered include (1) the purposes of the plan; (2) the amount of the plan assets; (3) financial and industrial conditions; (4) the type of investment, whether mortgages, bonds or shares of stock or otherwise; (5) distribution as to geographical location; (6) distribution as to industries; (7) the dates of maturity.

H.R.Rep. No. 1280, 93d Cong., 2d Sess. (1974), reprinted in 1974 U.S.Code Cong. & Admin. News 5038, 5084-85 (Conference report at 304). Without minimizing the importance of the usual need for diversification of a plan's portfolio, however, the foregoing open-ended "facts and circumstances" list ought to caution judicial review of investment decisions. It is clearly imprudent to evaluate diversification solely in hindsight—plan fiduciaries can make honest mistakes that do not detract from a conclusion that their decisions were prudent at the time the investment was made.

To establish a violation, a plaintiff must demonstrate that the portfolio is not diversified "on its face." *Id.* at 5084; *Reich v. King,* 867 F.Supp. 341 (D.Md.1994). Once the plaintiff has established a failure to diversify, the burden shifts to the defendant to show that it was "clearly prudent" not to diversify. *In Re Unisys Savings Plan Litigation,* 74 F.3d 420, 438 (3d. Cir.1996). Prudence is evaluated at the time of the investment without the benefit of hindsight.

We review the district court's factual findings and inferences under a clearly erroneous standard and its legal conclusions de novo. *Reich v. Lancaster,* 55 F.3d 1034, 1044-45 (5th Cir.1995).

The district court credited Graham's testimony that, in purchasing the Property, he was attempting to increase the return on the plan's investments which previously had been entirely in short-term monetary or cash equivalent investments. The court found Graham knowledgeable in industrial-warehouse property, particularly those sites located in Grand Prairie. Before purchasing the Property, Graham discussed the purchase with the Plan's accountant, lawyer and actuary, as well as the Plan's major participants.[3] The major plan participants also had considerable experience in commercial real estate development in the area. A contemporaneous independent appraisal valued the property significantly higher than its purchase price. Graham believed the property was undervalued and anticipated selling it by 1986. The court concluded that Mr. Graham "exercised proper due diligence and prudence."

The court ultimately concluded that Mr. Graham had not violated his duty to diversify so as to minimize risk of large loss by investing 63% of the Plan's assets in one parcel of real property. The court found that "at no time relevant has there been a "risk of large loss,' " and, "given the 1985 non-diversified conditions of the portfolio, value of the real estate then and now, and the purchase price paid, ... his purchase decision was clearly a prudent one under all the circumstances at the time as viewed

---

[3]The other plan participants were consulted not only about the advisability of the purchase of the Property in general but about whether to purchase only half the Property or the entire 24-acre lot. The consensus was to purchase the entire Property.

from the standpoint of a prudent man acting in a like capacity." The court also observed that no participants had lost benefits, nor were they likely to lose benefits in the future as a result of the purchase of the Property.[4]  *Id.* at 11.

The Secretary contends that, as a matter of law, purchasing the Property constituted a failure to diversify on its face and that Graham did not prove at trial that it was clearly prudent not to diversify under the circumstances.  We disagree.  Even assuming *arguendo* that the plan's purchase of the property meant that the plan was not diversified on its face, we affirm the district court's decision because its findings demonstrate that, under the circumstances, it was clearly prudent not to diversify.

Both the diversification requirement and the clearly prudent exception to diversification must be analyzed from the perspective of what both parties acknowledge as their purpose:  to reduce the risk of large loss.  Several factors specific to this case indicate that Graham did not imprudently introduce a risk of large loss by purchasing the Property.  First, the plan was not required to make payments to beneficiaries until age 65, death, or disability, and the average age of the plan participants was 37 years when the

_____

[4]The court further observed "that in the ten (10) plus years since the Property was purchased, the last four (4) of which have been in this litigation, the parties have spent several hundreds of thousands of dollars in this litigation.  The Court finds that much of this money has been spent by the U.S. taxpayer.  The Court finds that it is uncontroverted that to date from the inception of this Plan in 1973 not one single beneficiary has lost one dime of benefits to which he or she is entitled.  The Court finds that it is not likely that any of them will, at least not as a result of the purchase of this Property by the Plan in 1985."  *Id.*

6

Property was purchased. Accordingly, the cash then remaining in the plan was sufficient to cover projected Plan payouts for the next 20 years.[5] The relative youth of the participants made it appropriate to evaluate the risk of the plan investments over an extended time frame, thus minimizing the risks associated with short-term fluctuations in asset values.[6]

---

[5]In addition, at the time of the purchase, the plan had been receiving significant annual cash contributions from GAI. For example, in 1985, GAI contributed $553,715 in contributions to the plan. Although these substantial contributions did not continue in the years after the purchase, Graham's expert, William Allbright, testified that the reasonable expectation that such large contributions would continue supports the prudence of Graham's decision. The substantial cash contributions not only would provide further cushion for any plan needs, but could also be expected to dramatically reduce the portion of the plan assets allocated to the Property.

[6]The Secretary contends that the plan horizon should not be a factor in evaluating the whether the trustee has appropriately diversified to reduce the risk of large loss, since losses are not postponed until the investment is liquidated, citing *Donovan v. Bierwirth,* 754 F.2d 1049, 1057-58 (2d Cir.1985) (*Bierwirth II* ). The *Bierwirth II* court was not faced with the same situation present here: an injunction had already been issued on the basis that the trustees acted improperly and the *Bierwirth II* court was discussing the proper measure of loss to the Plan and its timing. *Id.* at 1052. We express no opinion concerning the *Bierwirth II* rationale because we are not asked to determine the appropriate time to measure actual loss to the plan, but rather to determine what factors the fiduciary may consider in evaluating the portfolio's risk of large loss. We think it is entirely appropriate for a fiduciary to consider the time horizon over which the plan will be required to pay out benefits in evaluating the risk of large loss from an investment strategy. It is an entirely different question than determining when and how to measure damages to make the beneficiaries whole once a trustee has been found to have breached his fiduciary duty. The other cases relied on by the Secretary also involved trustees who had already been found liable and were only concerned with the measure of damages. *See Davidson v. Cook,* 567 F.Supp. 225, 240 (E.D.Va.1983), *aff'd mem.* 734 F.2d 1 (8th Cir.1984) *and Freund v. Marshall & Ilsley Bank,* 485 F.Supp. 629, 642-43 (W.D.Wis.1979)

Furthermore, the language relied on in *Bierwirth II* is

Second, at the time of the purchase, an important concern to Graham, and an ominous "risk of large loss," was the prospect that high inflation would return. According to Graham's expert William Allbright, when the plan's holdings consisted solely of cash and short term instruments, there was little hedge against inflation. The purchase of real estate historically had provided excellent protection against inflation and could reasonably have been seen as an effort to diversify the portfolio to offset that risk.[7] The

---

clearly dicta: in that case the stock purchased in the breaching transaction had been sold prior to the damages determination, mooting the issue of when to fix the loss. *Id.* at 1057. In writing this part of the opinion, clearly not required by the dispute before it, the court explicitly disagreed with common law decisions holding otherwise. *See In re Whitely,* 33 Ch.D. 347, 354-55 (Ct.App.1886), *aff'd sub nom. Learoyd v. Whitely,* 12 App.Cas. 727 (House of Lords 1887).

[7]Allbright testified that the extended plan horizon further supported Graham's decision to diversify into real estate. Relevant portions of his testimony include:

> Q. Is it conceivable that a plan that has a time horizon of starting with a census average age of 37 years old could be too conservative?
>
> A. Yes.
>
> Q. Is it possible that such a plan that had itself invested in nothing but short-term government securities might really have been too conservative at that point in time?
>
> A. Yes.
>
> Q. What is the main thing the plan is trying to protect itself from like the Graham profit-sharing plan?
>
> A. From the devastation of inflation, to provide inflation-protected benefits so that, upon retirement age, these people will have a right to receive benefits that at least have kept up with the cost of living.
>
> Q. Do you believe that short-term government securities

purchase of the Property achieved *greater* diversity in plan assets than had existed.

Third, the significant cushion between the purchase price and the contemporaneous independent appraisal, and fourth, Graham's expertise in the development of this type of industrial property further support the conclusion that the investment in the Property was a prudent one.

The district court did not clearly err in crediting all this evidence and finding that the investment did not carry a "risk of large loss" at any relevant time. We reject the secretary's criticism of this finding. Under the circumstances of this case, irrespective whether the purchase of the Property in 1985 meant that the plan was not diversified on its face, it was clearly prudent not to diversify.

The Seventh Circuit addressed a similar situation in *Etter v. J. Pease Constr. Co.,* 963 F.2d 1005 (7th Cir.1992). In *Etter,* the

---

can provide that type of [protection] from inflation?

A. I don't believe they do, and it's supported by statistical information that they do not.

Q. Do you believe sir, is it your opinion that in or around April of 1985, that actually the Graham profit-sharing plan needed to diversify?

A. Yes.

Q. And do you have any—can you give us any input as to whether you think that the diversification into real estate was a good or bad idea?

A. I think the diversification step into real estate at the time to accomplish the objectives of the plan which, again, were to provide inflation-protected benefits was a good decision.

plan invested $112,850 of its $127,993.43 in assets, or about 88%, in a single piece of local real estate. *Id.* at 1008. The plan trustees "although not "sophisticated' investors, were experienced in real estate and knew the local market and development potential in the county." *Id.* The trustees were partners with the Plan in the purchase, investing their own funds in the same property. *Id.* The court of appeals affirmed the district court's conclusion that it was clearly prudent not to diversify under the circumstances. *Id.* at 1011. Specifically, the court of appeals approved the trial court's consideration of the trustee's knowledge of real estate, knowledge of area development, and investigation of the property. *Id. See also Reich v. King,* 867 F.Supp. 341, 344-45 (D.Md.1994) (investment of 70% of plan assets invested in residential mortgages in one county; held clearly prudent not to diversify where administrator, a plumbing contractor, was knowledgeable about local real estate market and conducted sufficient investigation).[8]

---

[8]The district court in King awarded the defendant attorneys' fees as the prevailing party under the Equal Access to Justice Act, 28 U.S.C. § 2412(d)(1)(A). *Id.* On appeal of that award, the Fourth Circuit affirmed the district court's finding that the Secretary's position was not even "substantially justified" under the Act. *Reich v. Walter King Plumbing & Heating Contractor, Inc.,* 98 F.3d 147, 152 (4th Cir.1996). The Secretary argued that the concentration of assets in real estate mortgages in a single geographical area exposed the plan to four specific risks of large loss: default risk, interest rate risk, inflation risk, and liquidity risk. *Id.* However, the court concluded that the Secretary "did not identify any specific reasons suggesting the likelihood of a significant downturn in the local economy, a sudden change in interest rates, a drastic increase in inflation, or an unexpected demand for benefit payments." *Id.* The district court in *King* appropriately credited testimony reflecting "the actual realities of mortgages in Frederick County" to determine that the plan did not face the risk of large losses due to non-diversification. 867 F.Supp. at 344-45.

10

The Secretary argues that the *Etter* decision and the district court decision allow satisfaction of the prudence requirement to wipe out the separate and independent requirement of diversification. We disagree. When there is a lack of diversification, the statute requires the trustee to show that it was clearly prudent not to diversify. 29 U.S.C. § 1104(a)(1)(C). In *Etter,* the district court found that it was prudent "not to diversify plan funds at the time of the Glacier Ponds investment." 963 F.2d at 1011. The *Etter* court looked at numerous factors, such as the investigation of the purchase, the evaluation of other investment alternatives, and the relative expertise of the trustee—all factors which are relevant to whether there was a risk of large loss. *See id.* Similarly, the district court in this case evaluated numerous factors, discussed above, which are directly relevant to the prudence of the failure to diversify (assuming the portfolio was not sufficiently diverse), in order to determine whether there was a risk of large loss. Both the diversification requirement and the statutory allowance of non-diversification in

---

In the present case, there is no significant interest rate risk because the plan paid cash for the Property; there was no significant liquidity risk because the plan's cash position could cover any potential claims for benefits; and there was no significant inflation risk because the evidence suggested that the purchase of the property provided long-term protection from inflation. The only one of the four risks argued by the Secretary in *King* that was associated with Graham's purchase of the Property is that of a significant downturn in local real estate. While such a temporary downturn in fact occurred in Texas real estate, there was no suggestion at trial that, from the standpoint of a reasonable investor in 1985, such a downturn was foreseeable or even likely.

11

circumstances when it is prudent not to diversify are primarily concerned with minimizing the risk of large loss. The court's explicit finding that there was not a risk of large loss, based on his conclusion that Graham put on the more persuasive case, minimizes the Secretary's concern about weakening ERISA's diversification requirement.

### III. Duty of Loyalty

The Secretary also alleged that Graham violated his duty of loyalty as plan trustee by not appointing a neutral fiduciary or taking other precautions before purchasing the Property. ERISA § 404(a)(1) provides that

> a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > >
> > > (ii) defraying reasonable expenses of administering the plan ...

29 U.S.C. § 1104(a)(1)(A). The Secretary contends that Graham did not discharge his duties solely in the interest of the participants because he owned interests in nearby parcels of land. Graham's other investments were allegedly enhanced in value by the plan's purchase of the Property, and the other parcels were in competition with the Property for potential buyers. The conflict was particularly evident, the Secretary urges, because Graham used a single agent to market the Property along with the other parcels in which he had an interest; this situation allegedly created the

12

temptation to prefer Graham's personal property investments over the plan's Property in the marketing process.

Nevertheless, the district court concluded that Graham did not breach his fiduciary duty of loyalty, stating that:

> merely because Graham was a partner in other real estate investments in the area it was not a breach of his fiduciary duty to acquire the land on behalf of the Plan, nor was it, under the specific facts of this case, a breach of his fiduciary duty to try to market the Plan's Property in a package along with the property he had an interest in, since doing so provided a larger market of potential purchasers.

The court further found that Graham's control of the adjacent parcels "actually inured to the benefit of the Plan."

On appeal, the Secretary contends that there is no evidence that Graham took necessary steps to alleviate the potential conflict before purchasing the property. Specifically, the Secretary argues that given the potential conflict, Graham should have either appointed a neutral fiduciary to administer the plan or taken "every feasible precaution to see that [he] had carefully considered the other side, to free [himself], if indeed this was humanly possible, from any taint." *Donovan v. Bierwirth,* 680 F.2d 263, 271-72 (2d Cir.), *cert. denied* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982).

Graham counters that he at all times acted solely in the interests of the plan in making the purchase of the Property. Graham's other interests in adjacent property were known to the plan participants, and a majority in interest of the participants concurred in the decision to purchase the Property. Graham investigated the soundness of purchasing the property as a plan

13

investment by obtaining an independent appraisal of the property, consulting the plan's actuary, accountant and lawyer, and conducting enough analysis to convince himself that the investment was in the plan's best interests. The district court clearly credited this evidence of fair dealing in reaching its conclusion, and the court's findings are not clearly erroneous or infected with legal error.

It should be remembered that the *Bierwirth* case and other decisions relied on by the Secretary involved the commitment of plan assets to corporate control contests in which the plan trustees' jobs were at stake. 680 F.2d at 271. *See also Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984). Judge Friendly articulated the corporate directors' duties in *Bierwirth* with a particular eye to the fact that the control contest was "an unusual situation peculiarly requiring legal advice from someone above the battle." *Bierwirth,* 680 F.2d at 272-73. Indeed, in the appeal after remand, the court noted that since plan fiduciaries may often "be called upon to make decisions regarding tender offers and other contests for corporate control ... there is a need to deter abuses in these areas, where the temptation to misuse funds often may be especially strong." *Bierwirth II,* 754 F.2d at 1055-56 (citations omitted). Graham's ownership of neighboring parcels is a far cry from that type of conflict. The level of precaution necessary to relieve a fiduciary of the taint of a potential conflict should depend on the circumstances of the case and the magnitude of the potential conflict. Furthermore, even under those decisions, the district

14

court's findings that Graham reasonably believed he was acting in the participants' best interests, that Graham acted prudently in his decision to purchase the property, and that Graham's decisions inured more to the plan's benefit than to his own would support affirmance of the verdict. *See Bierwirth,* 680 F.2d at 271 ("... officers of a corporation who are trustees of its pension plan do not violate their duties as trustees by taking action which, after careful and impartial investigation, they reasonably conclude best to promote the interests of participants and beneficiaries simply because it incidentally benefits the corporation or, indeed, themselves" as long as their decisions are "made with an eye single to the interests of the participants and beneficiaries") *and Leigh,* 727 F.2d at 127 (consistent use of plan's assets in interest of plan beneficiaries over an extended period of time in control contests would be probative of the propriety of the trustee's actions).

There was no evidence that in purchasing or marketing the Property Graham ever placed his interests over the plan's interest or ever failed to keep "an eye single to the interests of the participants and beneficiaries." *See Bierwirth,* 680 F.2d at 271. We agree with the district court's conclusion that "clearly Graham did not breach his fiduciary duty of loyalty."

### IV. Conclusion

For the foregoing reasons, we AFFIRM the decision of the district court that the Secretary take nothing in this action.

15