**UNITED STATES COURT OF APPEALS**
**For the Fifth Circuit**

No. 97-11023

LABORERS NATIONAL PENSION FUND,
an employee pension benefit plan, et al,

Plaintiffs,

BILL L HARBERT, Board of Trustee; ARTHUR A COIA, Board of
Trustee; BRUCE HUGHES, Board of Trustee; R P VINALL, Board of
Trustee; ROBERT D SHEEHAN, Board of Trustee; MASON M WARREN,
Board of Trustee; BILLY L HARBERT, JR, Board of Trustee;
CARL E BOOKER, Board of Trustee;

Plaintiffs-Appellees,

VERSUS

NORTHERN TRUST QUANTITATIVE ADVISORS, INC., a corporation;
THE FIRST NATIONAL BANK OF CHICAGO, a corporation; AMERICAN
NATIONAL BANK AND TRUST COMPANY OF CHICAGO, a corporation;

Defendants,

NORTHERN TRUST QUANTITATIVE ADVISORS, INC., a corporation;
AMERICAN NATIONAL BANK AND TRUST COMPANY OF CHICAGO,
a corporation;

Defendants-Appellants.

1

April 16, 1999

Before EMILIO M. GARZA, BENAVIDES and DENNIS, Circuit Judges.

DENNIS, Circuit Judge:

The Laborers National Pension Fund (Fund) filed suit against American National Bank and Trust Company of Chicago (ANB) for damages because of breach of fiduciary duties as the Fund's investment manager under the Employment Retirement Income Security Act of 1974 (ERISA), 29 U.S.C. §§ 1001 *et seq*. After a bench trial, the district court determined that ANB's purchase of interest-only mortgage-backed securities (IOs) was not a prudent investment and rendered a money judgment for the Fund against ANB. We reverse and render judgment for ANB.

## Factual and Procedural Background

The Fund was established in 1968 to provide retirement income for laborers employed in several southern and central states. It is governed by a volunteer Board of Trustees (Trustees) who represent contributing employers and union officials. From 1971 to 1994, the Fund hired ANB as one of several investment managers responsible for handling its $1 billion portfolio. The Fund's portfolio has two types of accounts: fixed-income (bonds and mortgage-backed securities) and equity (stocks). In September 1991, ANB invested $11 million of the Fund's fixed-income account in IOs. ANB sold the IOs at a loss for $4.2 million in September

2

1992.  Despite this loss, the portion of the Fund's total portfolio (fixed-income and equity) managed by ANB experienced a positive return of 6 percent for calendar year 1992, generating approximately $18 million.[1]

Interest-only mortgage-backed securities (IOs) were created in the late 1980s.  An IO is a right to receive a portion of the interest only from payments on mortgage loans.  Each IO is paid from the stream of interest payments made on mortgage loans by a pool of homeowners.  Thus, prepayment of mortgage loans by members of the pool tends to diminish or extinguish the yield on the related IO.  The rate at which mortgages are paid off increases more than expected if interest rates on mortgage loans decline unexpectedly prompting an unanticipated higher number of homeowners to refinance.  Given these characteristics, IOs can result in significantly greater price and yield volatility than traditional debt securities.  See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 6 (2d Cir. 1996), cert. denied, 117 S. Ct. 2433 (1997).  In addition, however, IOs can serve as a hedge to prevent significant losses in value due to interest rate changes because IOs generally increase as interest rates rise and mortgage-backed securities generally decline as interest rates rise.  Id. at 3-4.

---

[1]In 1991, six investment managers handled the Fund's assets. During that year, ANB managed approximately $170 million of the Fund's fixed-income account and $130 million of the Fund's equity account.  The $11 million IO investment represented 6.5 percent of the Fund's fixed-income account managed by ANB and 3.7 percent of the Fund's total portfolio managed by ANB.

The Fund and the Trustees sued ANB in 1995 for breach of fiduciary duties pursuant to ERISA. Following a bench trial, the district court determined that (1) ANB failed to consider the Fund's investment guidelines or whether IOs would violate the spirit of the guidelines; (2) ANB's investment in IOs was not consistent with the Fund's stated guidelines; and (3) a prudent investment manager would not consider IOs an appropriate investment for the Fund in light of the Fund's guidelines. In its written opinion, the district court stated that "[i]t does not matter that other investment consultants in the industry held the opinion that IOs were appropriate for modern investment portfolios or that the portfolio as a whole made an adequate return." Based on a conclusion that ANB failed to fulfill its fiduciary duties, the district court awarded the Trustees $7,161,549 in damages. ANB filed a notice of appeal, after which the district court entered an amended final judgment awarding the Trustees $281,937 for prejudgment interest and $398,384 for attorneys' fees.

## Standards of Review

The district court's findings and inferences of fact are reviewed under the clearly erroneous standard, and its interpretations and applications of law are reviewed de novo. Metzler v. Graham, 112 F.3d 207, 209 (5th Cir. 1997); Reich v. Lancaster, 55 F.3d 1034, 1044-45 (5th Cir. 1995).

## Discussion

4

ERISA was enacted to regulate employee benefit plans and protect the funds invested in such plans. 29 U.S.C. § 1302(a). ERISA assigns to plan fiduciaries "a number of detailed duties and responsibilities, which include 'the proper management, administration, and investment of [plan] assets, the maintenance of proper records, the disclosure of specified information, and the avoidance of conflicts of interest.'" Mertens v. Hewitt Associates, 508 U.S. 248, 251-52, 113 S. Ct. 2063, 124 L.Ed.2d 161 (1993) (citation omitted).

In ERISA, "[r]ather than explicitly enumerating all of the powers and duties of trustees and other fiduciaries, Congress invoked the common law of trusts to define the general scope of their authority and responsibility."[2] Central States, Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570, 105 S. Ct. 2833, 86 L.Ed.2d 447 (1985). The manner in which trustees and other fiduciaries may exercise their powers, however, is further defined in the statute through the provision of strict standards of conduct, also derived from the common law of trusts – most prominently a standard of loyalty and a standard of

---

[2]Traditionally, fiduciaries have abided by the common law of trusts which held that the riskiness of each investment in a portfolio must be measured in isolation. Leslie J. Bobo, Comment, Nontraditional Investments of Fiduciaries: Re-Examining the Prudent Investor Rule, 33 Emory L.J. 1067, 1078 (1984); see also Chase v. Pevear, 419 N.E.2d 1358, 1366 (Mass. 1981) and In re Bank of New York, 323 N.E.2d 700, 703 (N.Y. 1974) (stating that under common law, trustee must exercise prudence in making each investment and is chargeable with any loss for failing to do so).

prudence.  Id. at 570-71 (citing 29 U.S.C. § 1104(a)(1)(A) ("a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan") and 29 U.S.C. § 1104(a)(1)(B) (a fiduciary must act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims")).

In determining compliance with ERISA's prudent man standard, courts objectively assess whether the fiduciary, at the time of the transaction, utilized proper methods to investigate, evaluate and structure the investment; acted in a manner as would others familiar with such matters; and exercised independent judgment when making investment decisions.  Katsaros v. Cody, 744 F.2d 270, 279 (2d Cir.), cert. denied sub nom., 469 U.S. 1072 (1984). "'[ERISA's] test of prudence . . . is one of conduct, and not a test of the result of performance of the investment.  The focus of the inquiry is how the fiduciary acted in his selection of the investment, and not whether his investments succeeded or failed.'" Donovan v. Cunningham, 716 F.2d 1455, 1467 (5th Cir. 1983), cert. denied, 467 U.S. 1251 (1984).  Thus, the appropriate inquiry is "whether the individual trustees, at the time they engaged in the challenged transactions, employed the appropriate methods to

6

investigate the merits of the investment and to structure the investment." Donovan v. Mazzola, 716 F.2d 1226, 1232 (9th Cir. 1983), cert. denied, 464 U.S. 1040 (1984).

The Secretary of Labor may prescribe such regulations as he finds necessary to carry out the provisions of ERISA. 29 U.S.C. § 1135. In 1979 the Secretary prescribed regulations under ERISA further defining a fiduciary's investment duties. 29 C.F.R. § 2550.404a-1. In general, the regulations provide that the fiduciary shall be required to act as a prudent investment manager under the modern portfolio theory rather than under the common law of trusts standard which examined each investment with an eye toward its individual riskiness. Specifically, they state that a fiduciary's investment duties under 29 U.S.C. § 1104(a)(1)(B) are satisfied if he has given appropriate consideration to facts he knows or should know to be relevant to the particular investment or investment course of action involved, "including the role the investment or investment course of action plays in that portion of the plan's investment portfolio with respect to which the fiduciary has investment duties" and has acted accordingly. 29 C.F.R. § 2550.404a-1(b)(1)(i)-(ii). For these purposes, "appropriate consideration" includes determining that the investment or investment course of action "is reasonably designed, as part of the portfolio (or, where applicable, that portion of the plan portfolio with respect to which the fiduciary has investment duties), to further the purposes of the plan, taking into consideration the

7

risk of loss and the opportunity for gain (or other return) associated with the investment or investment course of action," and consideration of the following factors: "(A) The composition of the portfolio with regard to diversification; (B) The liquidity and current return of the portfolio relative to the anticipated cash flow requirements of the plan; and (C) The projected return of the portfolio relative to the funding objectives of the plan."  29 C.F.R. § 2550.404a-1(b)(2)(i)-(ii).

In investments, the term "derivative" refers to "financial instruments whose performance is derived in whole or in part from the performance of an underlying asset (such as a security index of securities)."  See BNA Pension Benefits Report No. 23, at 1046 (Apr. 15, 1996) (citing Department of Labor-Comptroller Letter of Guidance and Statement on Derivatives signed by Assistant Labor Secretary Olena Berg on Mar. 28, 1996).  Examples of these financial instruments include futures, options, options on futures, forward contracts, swaps, structured notes and collateral mortgage obligations, and interest-only and principal-only strips.  Id.; David R. Levin & Tess J. Ferrera, ERISA Fiduciary Answer Book 7-73, 7-74 (3d ed. 1998).  In the Letter of Guidance and Statement on Derivatives, the Department of Labor and the Comptroller made the following statements:

> Investments in derivatives are subject to the fiduciary responsibility rules in the same manner as are any other plan investments . . . . In determining whether to invest in a particular derivative, plan fiduciaries are required to engage in the same general procedures and

8

undertake the same type of analysis that they would in making any other investment decision. This would include, but not be limited to, a consideration of how the investment fits within the plan's investment policy, what role the particular derivative plays in the plan's portfolio, and the plan's potential exposure to losses.

\* \* \*

Plan fiduciaries have a duty to determine the appropriate methodology used to evaluate market risk and the information which must be collected to do so. Among other things, this would include, where appropriate, stress simulation models showing the projected performance of the derivatives and of the plan's portfolio under market conditions. Stress simulations are particularly important because assumptions which may be valid for normal markets may not be valid in abnormal markets, resulting in significant losses . . . .

\* \* \*

Investment managers are also charged with making investments in accordance with documents and instruments governing the plan insofar as the plan documents are consistent with the provisions of ERISA. 29 U.S.C. § 1104(a)(1)(D). The Fund investment guidelines in the present case, in pertinent part, provide:

1. Investments are limited to holdings which would be permitted under the prudent man rule as set forth in the Employee Retirement Income Security Act of 1974.

\* \* \*

4. Bond investments shall be limited to Federal or Federal Agency obligations or corporate bonds of the first three quality grades (at the time of purchase) as established by one or more of the nationally recognized bond rating services . . . .

5. The investment managers are not authorized to engage in investment transactions involving stock options, short sales, purchases on margin, letter stocks, private placement debt, commodities, venture capital. Future investments in foreign securities will not be made without prior consultation with, and approval by, the Board of Trustees . . . .

The parties treated the Pension Fund Investment Philosophy and

9

General Policy on Investments as part of the plan documents.  The

Investment Philosophy, in pertinent part, provides:

> The Trustees of the Laborers National Pension Fund, in order to protect the interests of the participants and beneficiaries for the purpose of providing them with benefits and defraying the reasonable expenses of administering the Plan, are committed to protect the corpus of the Fund, meet the actuarial assumptions, and comply with applicable Federal and state laws.  In order to accomplish these goals in a prudent manner, the Trustees believe that the investments of the Fund must be diversified among government securities, bonds, mortgages, common stock, real estate, insurance company contracts, money market instruments, and other appropriate investments.  Therefore, it will be the policy of the Trustees to invest the assets of the Fund with care in those vehicles which should preserve the principal while recognizing the need for income and appreciation with a minimal risk.  This policy will be carried out by the Trustees in a prudent manner with the assistance of reputable professional money managers, consultants, insurance companies and banks to make the investments.  The performance of these investments will be reviewed at least quarterly using various evaluation techniques that prove reliable and face-to-face discussion and review among the parties . . . .

And the General Policy on Investments, in pertinent part, states

that:

> a)   It is the intention of the Board of Trustees to allow the investment manager full discretion within the scope of the agreed upon investment guidelines and restrictions.  The manager's performance in meeting the Fund's objectives will be reviewed on a regular periodic basis.  Results based on a total rate of return (including both realized and unrealized gains and losses) will be evaluated quarterly by a professional service retained by the Trustees.
>
> * * *
>
> c)   All investment managers will be providing quarterly reports to the Trustees in the requested format. The reports include a review of previous actions, current status of the portfolio, recommendations, etc.  If changing market or economic conditions or

10

other events suggest that a special meeting or action of the Trustees is necessary it is expected that the manager will communicate with the Trustees promptly rather than waiting for submission of the scheduled report.

d)  If in the judgment of the investment manager strict adherence to one or more of the following investment guidelines in connection with a specific transaction is not in the best interests of the Laborers National Pension Fund or would produce an undesirable investment result the manager shall consult with the Trustees before proceeding with the transaction.

The district court clearly erred in determining that ANB failed to consider Fund guidelines before purchasing IOs. During the period at issue, Tom Pierce was ANB's Director of Fixed Income. Before Mr. Pierce authorized the purchase of IOs in 1991 he and his ANB associates consulted the ANB documents that incorporated the Fund guidelines, reviewed general literature on IOs and discussed the merits of investing in IOs with brokers. Mr. Pierce also utilized electronic Bloomberg stress simulation models to project the performance of IOs and the Fund's portfolio under market conditions. The Bloomberg stress simulation models based their projections on the prepayment histories of various securities based upon interest rate changes. Mr. Pierce considered the whole universe of investment grade, fixed-income alternatives and evaluated the risks and rewards associated with these securities relative to a Lehman Brothers Aggregate Index.

Not only did Mr. Pierce consider the risks associated with IOs in the context of the goals of the Fund; ANB also convened an Account Review Committee which met quarterly to review client

11

objectives and to ascertain whether ANB's investment decisions complied with these objectives. ANB invested in IOs on behalf of several pension plans covered by ERISA and the Account Review Committee approved the use of IOs in the Fund's fixed-income account prior to their purchase. In addition, Standard Valuations, the company retained by the Trustees to be responsible for monitoring ANB's compliance with the Fund guidelines, considered the IO investment permissible under the Fund guidelines. In fact, at least one other investment manager, Lazard Freres, made an IO investment for the Fund under the same investment guidelines during the same period of time.

As we read the plan documents and instruments, ANB's investment in IOs was not a violation of the investment guidelines or their spirit. The documents and instruments governing the plan must generally be construed in light of ERISA's policies, and those documents cannot excuse either the trustees or the investment managers from their duties under ERISA. Central States, 472 U.S. at 568. In interpreting the provisions of plan documents and instruments such as the investment guidelines with this view, we are also guided by the principles of trust law. Firestone v. Bruch, 489 U.S. 101, 111, 109 S. Ct. 948, 103 L.Ed.2d 80 (1989) (citing Central States Southeast and Southwest Areas Pension Fund v. Central Transport, Inc., 472 U.S. 559, 570 (1985)). As they do with contractual provisions, courts construe terms in trust agreements without deferring to either party's interpretation.

12

"'The extent of the duties and powers of a trustee is determined by the rules of law that are applicable to the situation, and not the rules that the trustee or his attorney believes to be applicable, and by the terms of the trust as the court may interpret them, and not as they may be interpreted by the trustee himself or by his attorney.'" Firestone, 489 U.S. at 112 (citing 3 William F. Fratcher, Scott on Trusts § 201, at 221 (1988)). "The terms of trusts created by written instruments are 'determined by the provisions of the instrument as interpreted in light of all the circumstances and such other evidence of the intention of the settlor with respect to the trust as is not inadmissible.'" Firestone, 489 U.S. at 112 (citing Restatement (Second) of Trusts § 4, Comment d (1959)). Giving the written words of the guidelines their plain meaning within the context of trust law principles and ERISA policies, we conclude that the guidelines neither expressly nor implicitly prohibit investments in IOs of the first three quality grades; and that there is no reasonable basis for reading such a prohibition into the plan documents.

On the other hand, we find the interpretation of the Fund guidelines by the district court and the Trustees to be unreasonable under the ordinary meaning of the words of the document and especially so in light of the ERISA policies and the principles of trust law. The Investment Philosophy requires the Trustees to "protect the interests of the participants and beneficiaries for the purpose of providing them with [pension and

13

other] benefits . . . protect the corpus of the Fund, meet the actuarial assumptions, and comply with applicable Federal and state laws . . . diversif[y] [investments] among government securities, bonds, mortgages, common stock, real estate, insurance company contracts, money market instruments, and other appropriate investments . . . [and] invest the assets of the Fund with care in those vehicles which should preserve the principal while recognizing the need for income and appreciation with a minimal risk." The Trustees contend that the last clause implies a ban against IOs because derivatives involve a risk of loss of principal. We do not think that ambiguous clause standing alone justifies such an inference. Reading it together with the balance of the Investment Philosophy and plan documents, we are certain that it does not. The clear words of the Investment Philosophy and other plan documents require the Trustees to invest in many types of assets involving the risk of loss of principal, such as common stocks, real estate, insurance contracts, and money market instruments. Indeed, the evidence indicates that the Fund's equity and fixed-income portfolios have long contained many investments having risk of principal losses. The goals of the plan are to provide sufficient growth in assets for the payment of future pensions and other benefits to large numbers of participants and beneficiaries and to protect the Fund against inflation and depreciation. These objectives dictate an investment policy of reasonable risk, healthy appreciation and appropriate

14

diversification.  ERISA and the federal regulations likewise impose prudent fiduciary duties of careful investments for the same purposes.

The Fund guidelines expressly prohibit investments "involving stock options, short sales, purchases on margin, letter stocks, private placement debt, commodities [or] venture capital. . . ." IOs are not among the prohibited investments.[3]  The Fund guidelines stated that investments should be limited to federal agency obligations or corporate bonds of the first three quality grades. The IOs at issue met this requirement, as they were rated "AAA" at the time of their purchase.  Furthermore, the Investment Philosophy indicated that investments should be diversified among "government securities, bonds, mortgages, common stock, real estate, insurance company contracts, money market instruments, and other appropriate investments."  ANB's investment in IOs was reasonably designed as part of the Fund's portfolio to further the purposes of diversification as a hedge against possible interest rate hikes and consequent declines in values of fixed income securities.

The Fund's general policies further provide that investment managers are given full discretion to make decisions within the

---

[3]In 1994, the Trustees revised the Fund guidelines, adding IOs to the list of prohibited investments.  The Fund's counsel advised that the Fund guidelines should specifically state how mortgage-backed securities were to be treated.  The fact that the Trustees and the Fund's counsel recognized the need to revise the guidelines indicates that the guidelines did not prohibit this type of investment when ANB purchased the IOs.

15

scope of the Fund guidelines and that the results of their investment decisions would be evaluated quarterly by a professional service retained by the Trustees based on a total rate of return. The Trustees retained Standard Valuations for this purpose. The general policies also directed ANB to provide quarterly reports to the Trustees in a requested format reviewing previous actions, current portfolio status, and recommendations. There is no contention that ANB failed to cooperate with Standard Valuations in its evaluations or failed to file its own quarterly reports, properly disclosing detailed information concerning fund investments and management.

The Trustees argue that ANB breached its obligation to consult with them prior to the IO investment. On the contrary, however, the Fund guidelines and supporting documents require investment managers to consult with the Trustees and obtain prior approval of an individual investment in only two instances: (1) future investments in foreign securities; and (2) if in the judgment of the investment manager strict adherence to the guidelines in connection with a specific transaction is not in the best interests of the Fund or would produce an undesirable investment result. The Trustees do not contend that the IOs involved foreign securities. ANB considered the purchase of the small quantity of IOs to be a prudent investment within the portfolio designed as a hedge and to produce a desirable result for the portfolio as a whole. Therefore, because in the investment manager's judgment the IO

16

investments were in the best interest of the Fund, ANB was not required to obtain prior approval of those investments.

In support of its conclusion that IOs were inconsistent with the Fund guidelines, the district court stated: "It does not matter that other investment consultants in the industry held the opinion that IOs were appropriate for modern investment portfolios or that the portfolio as a whole made an adequate return." This statement indicates that the district court erroneously judged the IO investment in isolation under the common law trust standard, instead of according to the modern portfolio theory required by ERISA policy as expressed by the Secretary's regulations. The district court's reasoning, which the Fund urges again in its argument, is clearly at odds with ERISA and the regulations. A fiduciary may not discharge his duties in a manner inconsistent with ERISA provisions. 29 U.S.C. § 1104(a)(1)(D); see also Gruby v. Brady, 838 F. Supp. 820, 829 (S.D.N.Y. 1993) ("ERISA section 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D), requires fiduciaries to discharge their duties in accordance with plan documents only 'insofar as such documents and instruments are consistent with the provisions of [ERISA].'"). Since 1979, investment managers have been held to the standard of prudence of the modern portfolio theory by the Secretary's regulations. 29 C.F.R. § 2550.404a-1; Bobo, supra, at 1078. In case of a conflict, the provisions of the ERISA policies as set forth in the statute and regulations prevail over those of the Fund guidelines. There is no conflict in the

17

present case because the plan documents do not require that the prudence of the IO investments be judged in isolation, as the district court and the Trustees suggest. If they did, the plan documents and guidelines would be forced to yield to the regulations' requirement that the investment be reasonably designed as part of the portfolio to further the purposes of the plan.

Under a proper application of the correct legal principles to the evidence in the present case, there is not a reasonable basis for concluding that ANB or Mr. Pierce acted imprudently or in violation of their fiduciary responsibilities with regard to the 1991 investments in IOs. ANB considered the characteristics of IOs and utilized stress simulation models to project the performance of IOs and the Fund's portfolio under various market conditions before investing in IOs. The Fund's expert witnesses, none of whom were active or experienced ERISA plan investment managers, failed to point out any specific violation by Mr. Pierce or ANB of a fiduciary duty required by the prudent investor and modern portfolio standards of ERISA and the related federal regulations and guidance. Instead, the Fund's experts based their opinions that ANB's IO investments were imprudent on analysis of those investments standing alone, in isolation from the relevant portfolio. Also, despite their ultimate conclusions, one or more of the Fund's expert witnesses conceded that IOs can serve as a hedge against countervailing risks of a portfolio, the Fund guidelines did not prohibit the investment in IOs, the investment

18

community did not anticipate the sudden, unprecedented decrease in interest rates which accelerated the prepayment of mortgages in 1992, and Mr. Pierce sufficiently investigated the available data on the nature of the particular IOs prior to purchasing them.

ANB's expert witness, Mr. Henderson, an experienced ERISA plan investment manager, testified that ANB's IO investments were not imprudent when analyzed under the prudent investor, modern portfolio principles of ERISA and the pertinent Department of Labor regulations and guidances. He was the only expert witness who properly assessed ANB's IO investments as of the time they were made using the correct prudent man, modern portfolio ERISA principles. Mr. Henderson testified that in forming his opinion, he reviewed the quarterly reports issued by ANB to the Fund in 1991 and 1992; the data on the pertinent IOs available to ANB prior to the 1991 IO investments; the portfolio and investment goals and guidelines; and Standard Valuations' assessment of ANB's IO investments and overall performance for 1992. Based upon the Fund guidelines, the economic conditions that prevailed in September 1991, the makeup of the Fund's portfolio and Mr. Pierce's objectives for the portfolio, Mr. Henderson concluded that the IO investments were appropriate.

From our review of the record, we conclude that the Trustees failed to produce evidence from which it reasonably could be found that Mr. Pierce or ANB acted imprudently or that the IO investments in the present case violated the guidelines or ERISA policies.

19

Accordingly, we REVERSE the district court's judgment in favor of the Trustees and RENDER judgment in favor of the defendants-appellants and against the plaintiffs-appellees.