William E. BROCK, Secretary of Labor, Plaintiff-Appellant,

v.

Loran W. ROBBINS, et al., Defendants-Appellees.

No. 86–2211.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 25, 1987.

Decided Sept. 8, 1987.

George R. Salem, Solicitor of Labor, Allen H. Feldman, Associate Solicitor, Nathaniel I. Spiller, Carol A. DeDeo, Washington, D.C., for plaintiff-appellant.

John R. Climaco, Climaco, Climaco, Seminatore, Lefdowitz & Garofoli, Co., L.P.A., Cleveland, Ohio, Edward J. Egan, Chicago, Ill., for defendants-appellees.

Before CUMMINGS, and WOOD, Circuit Judges, and ESCHBACH, Senior Circuit Judge.

CUMMINGS, Circuit Judge.

This case is one of several lawsuits brought by the Secretary of Labor ("Secretary") that challenge alleged improprieties over a number of years in the management of the Teamsters Central States Southeast and Southwest Areas Pension and Health and Welfare Funds (the "Fund"). Most of the lawsuits have been settled by consent decree. This suit principally involves the conduct of trustees Thomas Duffey, Joseph Morgan, Jackie Presser, Jack Sheetz, John Spickerman and the estate of Frank Fitzsimmons, all of whom were trustees of the Fund during their December 19, 1975 meeting. The Secretary seeks both equitable relief and money damages. The district court held that although the trustees had engaged in imprudent conduct, their actions did not violate their fiduciary responsibilities under the Employee Retirement Income Security Act of 1974, 29 U.S.C. §§ 1001–1461 ("ERISA").

### I.

The facts, as found by the district court in an exceptionally thorough opinion and accepted by both parties for purposes of this appeal, establish the following. From the inception of the Fund in 1950 until January 31, 1976, the Fund provided medical and other benefits through a series of insurance policies. From 1960 until January 31, 1976, the Fund's primary insurer was Republic, a Texas-based insurance company. Since 1950, regardless of the insurer, Amalgamated Insurance Agency Services, Inc. and related companies, which were controlled by the late Allen Dorfman, provided all of the Fund's claims processing services.

During the early 1970s, there was extensive study regarding the conversion of the Fund's practice of using an outside insurer to a practice of self-funding or self-insuring its claims. It was expected that such a step, which was endorsed by a respected outside actuarial firm, would eliminate various costs involved in using outside insurers and would save the Fund millions of dollars. The passage of ERISA in 1974 eliminated various regulatory problems and made self-funding a viable alternative. In accordance with the recommendation of the Fund's staff including its Executive Director, Daniel Shannon, the trustees voted at their meeting on October 13, 1975, to become self-insured as of February 1, 1976.

The October 13, 1975, meeting also addressed how claims would be processed after February 1, 1976. The trustees decided to continue using Amalgamated for claims processing because it would have been difficult to obtain a different claims processor in time to handle the conversion to self-funding. Moreover, Amalgamated had done a competent and efficient job for the previous quarter century in processing claims. For example, Amalgamated was performing effectively when compared with other claims processors such as Blue Cross-Blue Shield, the only claims operation in the United States larger than the Fund. Although the decision to continue using Amalgamated was made at the October 13 meeting, there was no discussion of Amalgamated's fees.

On October 15, 1975, a self-funding committee was created by Shannon. Between October 15 and the next meeting of the trustees on December 19, 1975, the self-funding committee worked towards assuring a smooth transition to self-funding. For example, the committee met on November 13 with Michael Breen, the President of Amalgamated who was familiar with the conversion to self-funding of a welfare fund of the Michigan Teamsters. Although there was discussion of problems associated with conversion, there was no discussion of the fees that Amalgamated would receive.

At the crucial December 19, 1975, meeting of the Fund trustees, Teamsters President Frank Fitzsimmons, who was the presiding official, told the trustees after the scheduled business had been transacted that there was one more item that the trustees had to consider. Fitzsimmons then ushered in Breen and Dorfman from an area outside of the meeting room. Breen read a one-page proposal that Amalgamated perform the claims processing services for the Fund for a flat fee of

$435,000 per month for the first three months commencing February 1, 1976, $455,000 per month for the next nine months, and $480,000 per month for the second year.

Neither Shannon nor any other member of the Fund staff knew that Amalgamated representatives were going to make a presentation at the meeting. A five to ten minute discussion followed Breen's presentation. Neither Shannon nor any member of the Fund's staff present either participated in the discussion or objected to the proposal. There was no discussion of the basis for the monthly charges or the possibility of obtaining other proposals. Those present had little or no recollection at trial of the discussion during the meeting but some present remembered that the proposed fee was purportedly only a "nominal increase" over Amalgamated's then current compensation. No figures were presented at the meeting to support that assertion. After the brief discussion, trustees Fitzsimmons, Jackie Presser, Morgan, Duffey, Spickerman, and Sheetz voted unanimously to approve the proposed fees.

In the days and weeks following the December 19 meeting, the self-funding committee engaged in vigorous arms-length negotiation of the remainder of what was hoped would be a definitive contract with Amalgamated. The fees that the trustees had approved at the December 19 meeting, however, were not part of the negotiations. On January 31, 1976, the self-funding committee issued a final report recommending that the trustees approve the proposed agreement that the negotiations had produced.

The extensive negotiations between the Fund and Amalgamated resulted in the resolution of all but five items. At the trustees' February 11, 1976 meeting, after an extensive discussion of the proposed contract, Spickerman was directed to meet with the Amalgamated representatives the next day and, if Amalgamated acceded to the Fund's proposed language with respect to the five points of disagreement, sign the agreement on the Fund's behalf. On February 12, after Amalgamated accepted the Fund's terms on all five items of disagreement, the contract was signed retroactive to January 31, 1976.

## II.

The principal question before the district court was whether the then trustees violated their duties under ERISA by entering into the contract with Amalgamated. In order to understand the district court's decision, it is necessary to review the statutes involved in this case. Section 404(a)(1) of ERISA defines the duties that fiduciaries such as the trustees have under that statute. It provides that "a fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and—:"

(A) for the exclusive purpose of:

   (i) providing benefits to participants and their beneficiaries; and

   (ii) defraying reasonable expenses of administering the plan;

(B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.

29 U.S.C. § 1104(a)(1). Section 406(a) of ERISA, which defines certain prohibited transactions, provides that:

(1) A fiduciary with respect to a plan shall not cause the plan to engage in a transaction, if he knows or should know that such transaction constitutes a direct or indirect—

   \*     \*     \*     \*     \*     \*

(C) furnishing of goods, services, or facilities between the plan and a party in interest;

(D) transfer to, or use by or for the benefit of, a party in interest, of any assets of the plan ...

29 U.S.C. § 1106(a). Section 3(14)(B) provides that a "party in interest" includes a "person providing services to" an employee benefit plan. 29 U.S.C. § 1002(14)(B). ERISA section 408, however, removes certain transactions from the prohibition of

section 406. Specifically, it allows contracts involving "reasonable arrangements with a party in interest for office space, or legal, accounting, or other services necessary for the establishment or operation of the plan, if no more than reasonable compensation is paid therefor." 29 U.S.C. § 1108(b)(2). The critical analysis under section 406 therefore is whether more than reasonable compensation is paid to a party in interest.

The district court rejected the Secretary's argument that it is necessary to analyze this case both under sections 404 and 406. It reasoned that determining whether reasonable compensation was paid under 406 is "ultimately the same" analysis as that necessary under section 404 in determining whether the trustees violated the "prudent person" test of section 404.

As a preliminary matter, the district court rejected the Secretary's argument that provisions of the Amalgamated contract not related to the amount of fees were unreasonable. It found that all provisions other than fees were negotiated at arms length and that the contract was fair and reasonable in those respects. The court did conclude, however, that it was not "good fiduciary conduct" for the trustees to approve the fee schedule proposed at the December 19, 1975, meeting "without: (1) the item being on the agenda, (2) having a report or recommendation from the staff or the self-funding committee, (3) having at least a draft contract or outline spelling out what services Amalgamated was to perform, (4) any cost analysis or other explanation as to how the monthly fees had been calculated, (5) any representation as to the fee schedule's reasonableness other than that it was a 'slight increase' over the fees under the Republic arrangement, and (6) checking, at least briefly, to see whether or not there were other possible claims processors who might have taken over."

Having concluded that the decision to approve the fees was not "good fiduciary conduct," the court then determined whether the fees were "reasonable expenses of administering the plan" within the meaning of ERISA section 404(a)(1)(A)(ii). The Sec-

retary argued primarily that the fees were unreasonable because they represented a substantial increase over the fees paid by Republic to Amalgamated the previous year and were more than standard claims processing fees. The court rejected both of those arguments.

The court agreed with the Secretary that Amalgamated's aggregate monthly fees in the first year of the 1976 contract were substantially more than the aggregate fees received the previous year under the Republic-Amalgamated arrangement. In fact, it appeared that the total aggregate fees received in 1976 were 32% higher. However, the court concluded that this did not show that the fees were unreasonable. The court pointed out that Shannon and the trustees anticipated that the number of Fund beneficiaries and claims would increase substantially over the life of the new contract. The court found that this expectation was reasonable because the agreement under which Amalgamated had previously operated had resulted in monthly fee increases from $245,000 in 1973 to $381,000 in 1975. Based on Republic's estimate of $14,000,000 per month in premiums for the months of December 1975 and January 1976, Amalgamated's monthly compensation under the Republic contract would have been $420,000. The court noted that because the flat monthly fee commencing February 1, 1976, was $435,000, the increase was not the massive 32% increase that the Secretary suggested but an increase of 3.5%, consistent with the slight increase mentioned at the December 19, 1975, meeting. In short, the court found that because it was reasonable to assume for various reasons that the number of claims would increase, the trustees actually made an arrangement that at the time appeared to be one that would obtain the approval of an ERISA "prudent person."

Although the district court concluded that the trustees' conduct in considering and approving a contract is relevant to whether or not they acted prudently under ERISA, it stated that "the ultimate measure ... of their fiduciary performance is the reasonableness of the fees which they approved." On this issue, the court con-

sidered the testimony of the experts offered by both the Secretary and the defendants. While the Secretary's expert had more than 25 years of experience in advising hundreds of funds, he stated that he could have no opinion as to the reasonableness of Amalgamated's fees. Because he had no independent opinion, the court concluded that his testimony was of little assistance. We agree with that conclusion.

■ The evidence offered by the defendants' expert supported their contention that the fee provisions of the contract were reasonable. The expert believed that given the estimated expected premiums of $370 million from February 1, 1976, to December 31, 1977, a processing fee of 3%, or $11.1 million would have been very reasonable. Therefore, his opinion was that the aggregate flat fees of $10.68 million paid to Amalgamated for the same period were also reasonable. The expert also testified that a professional claims processor such as the Equitable Life Assurance Society would have charged 3.6% of claims processed. At the 3.6% rate, the fee would have been roughly $13.5 million, substantially above what the Fund actually paid.[1]

The testimony of the vice president and group actuary of Republic during most of the period that the Fund was insured by Republic also supported the conclusion that the fees charged were reasonable. He testified that in his experience with a substantial number of claims processors, charges ranged from 3% to 4%. He commented that Amalgamated provided more services for a 3% fee than some of the companies that charged 4%. He also noted that even though the Fund was the largest that he had handled, there had been no serious complaints about Amalgamated's services.

■ Based on the evidence before it, the court concluded that the Secretary "failed to establish by a preponderance of the evidence that, under all the circumstances prevailing on February 11, 1976, the trustees acted imprudently under ERISA in approving the Amalgamated contract." The court believed that because "the flat fees charged by Amalgamated were, under all the circumstances, fair and reasonable, the beneficiaries of the fund suffered no loss or damage but received substantial benefit from the trustees' converting to self-funding on February 1, 1976 and retaining Amalgamated as the claims processor, under the February 11, 1976 contract." The court then held that "[i]t follows from the foregoing that the trustees' action on February 11, 1976 in approving the Amalgamated contract violated neither section 404 or 406 of ERISA."[2]

---

1. The Secretary also contended that the contract allowed Amalgamated in some instances to be paid twice for processing the same claims because many of the claims that it would be compensated for under the new contract were already provided for under the Republic contract. The district court held that it was quite possible for a prudent trustee to have overlooked the formulas in the two contracts that allowed double compensation in some instances. The court pointed out that in over ten years of investigating the Fund, the various officials for the government had never noticed that double compensation was a possibility. In fact, the issue was never in the case until the court itself brought the issue up at trial. In any event, we agree with the court's conclusion that the failure to notice the possibility of double compensation did not violate the prudent person requirements of ERISA. In addition, even taking the amount of the alleged overpayment into account, the reasonableness of the compensation under the contract is not affected because the actual contract price was substantially below what a processor such as Equitable would have charged the Fund.

2. As noted above, the contract was not executed until February 12.

The court held that three other defendants, Andrew Massa, William Presser, and Roy Williams who became trustees after February 11, 1976, did not violate their duties under ERISA section 405(a)(2) which provides that a fiduciary may be liable for a cofiduciary's breach of duty if "by his failure to comply with section 1104(a)(1) of this title in the administration of his specific responsibilities which give rise to his status as a fiduciary, he has enabled such other fiduciary to commit a breach." 29 U.S.C. § 1105(a)(2). The district judge concluded that the individuals who became trustees after February 11, 1976, would have had no reason to question the reasonableness or fairness of the Amalgamated contract because it was in fact a fair contract. Therefore, it held that defendants Massa, Williams, and William Presser did not violate section 405. We agree with the district court's reasoning. The duties of new trustees under ERISA cannot include a requirement that they investigate how extensively the prior trustees had negotiated a contract

## III.

■ This case turns on our interpretation of ERISA section 404(a)(1)(B) which mandates that ERISA fiduciaries discharge their duties with prudence. In essence, the district court concluded that if a trustee enters into a contract with a fee provision with which a hypothetical prudent trustee would also agree, then the trustee does not violate his duties under ERISA even if, when entering into the contract, the trustee has no idea whether or not the provision of the contract is reasonable.

The district court treated this case as one of first impression, choosing to distinguish a number of cases that the Secretary argued supported his position. *See Leigh v. Engle,* 727 F.2d 113 (7th Cir.1984); *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.), *certiorari denied,* 469 U.S. 1072, 105 S.Ct. 565, 83 L.Ed.2d 506 (1984); *Donovan v. Cunningham,* 716 F.2d 1455 (5th Cir.1983), *certiorari denied,* 467 U.S. 1251, 104 S.Ct. 3533, 82 L.Ed.2d 839 (1984); *Donovan v. Mazzola,* 716 F.2d 1226 (9th Cir.1983), *certiorari denied,* 464 U.S. 1040, 104 S.Ct. 704, 79 L.Ed.2d 169 (1984); *Donovan v. Bierwirth,* 680 F.2d 263 (2d Cir.), *certiorari denied,* 459 U.S. 1069, 103 S.Ct. 488, 74 L.Ed.2d 631 (1982); *Eaves v. Penn,* 587 F.2d 453 (10th Cir.1978). While the Secretary may be correct that statements in those opinions could be interpreted as supporting the result that he seeks here, we agree with the district court's analysis that none of those cases controls this one. It is a cardinal rule of legal reasoning that one should not "take judicial language out of its original context and apply it uncritically in a materially different context." *In re Kaiser,* 791 F.2d 73, 76 (7th Cir.), *certiorari denied,* —— U.S. ——, 107 S.Ct. 655, 93 L.Ed.2d 710 (1986). Each of the cited cases contains material factual distinctions from this case. As the district court pointed out, those cases "almost without exception, involve (1) self-dealing by the fiduciary, or (2) jeopardizing the plan's assets by placing them at risk, or (3) direct loss resulting from the breach, or (4) a combination of the foregoing." There is no evidence here that any of the trustees were engaged in self-dealing or actions that jeopardized Fund assets. Moreover, the record supports the district court's finding that the fee terms were in fact reasonable and that therefore there was no loss resulting from trustees' imprudent conduct. The Secretary makes no serious attempt in this Court to challenge the district court's conclusion on the reasonableness of the fees approved by the trustees. As the recitation of the facts shows, the fees approved by the trustees were reasonable and therefore the trustees' action in approving them did not result in any loss to the Fund.

The district court noted that of the cases cited by the Secretary, *Katsaros v. Cody,* 744 F.2d 270 (2d Cir.1984), comes closest to the facts of this case. In *Katsaros* the trustees engaged in several questionable transactions including a $2 million loan to a bank corporation that had serious financial problems. There was no attempt by the trustees to obtain independent professional assistance or to analyze the financial data that had been presented to them by the borrower. The bank corporation defaulted on the loan after three payments and the fund lost $1.65 million. There was no doubt that a prudent trustee would not have made the loan. Like this case, there was no allegation of divided loyalty or self-dealing on the part of the trustees. The district court found the case inapposite primarily because "[t]he consequences, of course, were also quite different." In *Katsaros,* a reasonable investigation would have revealed that the transaction was imprudent and the resulting loss could have been expected. In this case, if there actually had been a reasonable investigation by a prudent trustee, that trustee would have agreed to the fee provisions that the defendant trustees initially agreed to on December 19, 1975. As the district court pointed out, "[f]ortunately for all con-

prior to entering into the agreement. Because the contracts here were reasonable and fair and because there is no indication that the new trustees believed otherwise, they cannot be deemed to have violated ERISA. Accordingly, we affirm the district court's holding that Massa, Williams, and William Presser did not violate their duties under ERISA section 405.

cerned, the Fund, its members and beneficiaries, and, above all the trustees, the fees, though not adequately investigated as to their basis and justification, turned out, under all the circumstances, to be fair and reasonable and the Fund and its members and beneficiaries received substantial benefit from the conversion to self-funding and the continued use of Amalgamated as the claims processor." We also agree with the district court that *Katsaros* is not controlling authority because there are substantial factual differences between *Katsaros* and this case.

Judge Will concluded that his review of the case law had revealed "that no court has held trustees liable in money damages for imprudent conduct which resulted in no loss or damages to the ERISA plan and no benefit or gain to the trustees and did not put the assets of the plan at risk." This is true. It is equally important to note, however, that no federal appellate court has ever had to address a fact situation comparable to the one here. In any event, addressing the issue as one of first impression, the district court held that the Fund was not entitled to any damages when the Secretary could show neither self-dealing nor loss to the Fund. We concur. If trustees act imprudently, but not dishonestly, they should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the Fund. The entire statutory scheme of ERISA demonstrates that Congress' overriding concern in enacting the law was to insure that the assets of benefit funds were protected for plan beneficiaries. *See, e.g., Leigh v. Engle,* 727 F.2d 113, 126 (7th Cir.1984). The only possible statutory purpose for imposing a monetary penalty for imprudent but harmless conduct would be to deter other similar imprudent conduct. However, honest but potentially imprudent trustees are adequately deterred from engaging in imprudent conduct by the knowledge that imprudent conduct will usually result in a loss to the fund, a loss for which they will be monetarily penalized. This monetary sanction adequately deters honest but potentially imprudent trustees. Any additional deterrent value created by

the imposition of a monetary penalty unrelated to actual loss is marginal at best. No ERISA provision justifies the imposition of such a penalty. *See* 29 U.S.C. § 1109(a) (imposing personal liability only for losses "resulting from each such breach" of fiduciary responsibilities).

■ While monetarily penalizing an honest but imprudent trustee whose actions do not result in a loss to the fund will not further the primary purpose of ERISA, other remedies such as injunctive relief can further the statutory interests. Section 502(a)(5) authorizes the Secretary of Labor to obtain appropriate equitable relief when the Secretary shows that a trustee has violated his fiduciary responsibilities. 29 U.S.C. § 1132(a)(5). If the Secretary can prove to a court that certain trustees have acted imprudently, even if there is no monetary loss as a result of the imprudence, then the interests of ERISA are furthered by entering appropriate injunctive relief such as removing the offending trustees from their positions. *See* 29 U.S.C. § 1109(a). The likelihood that a fund's assets will be unnecessarily diminished is greatly increased when its trustees show a propensity to engage in imprudent conduct. In determining the appropriate injunctive relief, it is irrelevant that the honest but imprudent actions of the trustees resulted in no loss to the fund. Honest but imprudent trustees can dissipate the assets of a fund with speed comparable to dishonest trustees. In either case, imprudent trustees undermine the purpose of ERISA which is to insure that the assets of a fund will be there when the beneficiaries need them. *See* 29 U.S.C. § 1104(a)(1)(A) (a fiduciary shall discharge his duties in the interest of beneficiaries and for the exclusive purpose of providing benefits to participants and their beneficiaries); *Blatt v. Marshall and Lassman,* 812 F.2d 810, 813 (2d Cir.1987). As the district court pointed out, it was only through "fortune" that "the fees, though not adequately investigated as to their basis and justification, turned out, under all the circumstances, to be fair and reasonable...." Beneficiaries of ERISA funds are entitled to have a

court issue "appropriate equitable relief" to insure that the trustees of their funds are not relying on mere fortune to manage the assets of the funds. Courts must, upon the application of the Secretary of Labor, use this equitable power to prevent imprudent conduct by trustees. *See* 29 U.S.C. § 1109(a) (allowing equitable relief independent of any financial loss that a breach of fiduciary duty may have caused).

A court, of course, can only issue appropriate equitable relief if it finds that a trustee has violated the provisions of ERISA. This brings us to the sole disagreement that we have with the district court. While we agree that ERISA sections 406 and 404(a)(1)(A)(ii) were not violated because the compensation paid for the fee processing services was reasonable, we conclude that the court's factual findings compel the conclusion that the prudent man standard of section 404(a)(1)(B) was violated by the Fund's trustees when they entered into the contract with Amalgamated. On December 19, 1975, they approved the fee provisions of the contract, committing the Fund to pay over $10 million after less than ten minutes discussion and without any study. At no time between the December 1975 meeting and the meeting formally approving the contract on February 11, 1976, did the trustees reconsider the fee provision of the contract. This is imprudent activity under section 404(a)(1)(B) and, for the reasons discussed, the policies underlying that section prohibit creating an exception that immunizes from appropriate injunctive relief trustees who have acted imprudently, even though they may not have been driven by sinister motives.

Because our reading of section 404(a)(1)(B) differs from that of the district court, we must remand this case to the district court to consider solely what equitable relief, if any, is appropriate under the circumstances. We fully agree with the district court that the Secretary failed in his attempt at trial to show any money damages resulting from the imprudent conduct of the trustees.

The record indicates that none of the trustees who engaged in the imprudent conduct in 1975 and 1976 still serve as trustees of the Fund. The record also shows that the former trustees were agreeable to the injunctive prohibitions that the Secretary sought during settlement negotiations but that the case was not settled for other unrelated reasons. Because of this state of affairs, this litigation, which began in 1978, should be resolved quickly upon remand.

We have considered the other arguments raised by the parties and conclude that further discussion is not warranted.[3] For the reasons set forth in this opinion, we remand the case to the district court to consider appropriate equitable relief. In all other respects, the decision of the district court is affirmed.

AFFIRMED IN PART, REVERSED IN PART.

---

**3.** For example, the Secretary also challenged the December 20, 1976, conduct of the then trustees in entering into a contract with the Travelers Insurance Company to provide dental benefits for the Fund. The Secretary claimed that the trustees had acted imprudently. After thoroughly considering the facts, the district court concluded that "[i]t is difficult to see what more [the trustees] could or should have done" before approving the contract. Our review of the record indicates that the facts, as delineated in the district court's comprehensive opinion, fully support that court's holding on this issue.