WILKINSON, Circuit Judge,
dissenting:
After a four-week bench trial, the district court found that the investment decisions of the R.J. Reynolds Tobacco Co. (RJR) fiduciaries were objectively prudent. It thus properly refused to hold the RJR fiduciaries personally liable for alleged plan losses.
Yet this court, breaking new ground, reverses the district court. With all respect for my two fine colleagues, I do not believe ERISA allows plan fiduciaries to be held monetarily liable for prudent investment decisions, and especially not for those made in the interest of diversifying plan assets. Market conditions can, of course, create fluctuations, but a prudent investment decision does not by definition cause a plan loss, the precondition under 29 U.S.C. § 1109(a) for imposing personal monetary liability upon fiduciaries.
The statutory remedy for a breach of procedural prudence that precedes a reasonable investment decision includes, explicitly, the removal of plan fiduciaries. The majority goes much further, forcing fiduciaries to face the prospect of personal monetary liability instead. This confusion of remedies is wrong three times over, and its consequences will be especially unfortunate for those who rely on ERISA plans for the prudent administration of their retirement savings. As for those who might contemplate future service as plan fiduciaries, all I can say is: Good luck.
First, and yet again, under the remedial scheme laid out by ERISA, fiduciaries should not be held monetarily liable for objectively prudent investment decisions. This is true for whatever standard— “would have,” “could have,” or anything else — one adopts for loss causation. As I shall show, the majority has adopted the wrong standard, one that strays from the statutory test of objective prudence under then existing circumstances, and one that trends toward a view of prudence as the single best or most “likely” decision rather than a range of reasonable judgments in the uncertain business of investing. Despite the majority’s protestations, its reversal of the district court’s well-grounded finding of objective prudence and its imposition of a far more stringent test signals *373 fiduciaries that henceforth they had better make a decision that in the light of hindsight proves the best.
Second, monetary liability is even less appropriate where, as here, the reasonable decision was taken in the interests of asset diversification. And third, on this record, the notion that the RJR fiduciaries’ decision to liquidate the Nabisco stocks was anything but prudent borders on the absurd.
ERISA is, first and foremost, meant to protect plan participants from large, unexpected losses, including those that result from holding undiversified single-stock non-employer funds. The fiduciaries knew this fact and acted upon it, only to find that prudent decisions, like good deeds, do not go unpunished when the breezes of legal caprice blow in the wrong direction.
As judges, we tend to regard the parties before us as antagonists. It is, after all, an adversary system. But, in a larger sense, the interests of plan participants and plan fiduciaries often align. It does neither any good to run up plan overhead with litigation over investment decisions taken, as this one was, to diversify plan assets and protect employees down life’s road. All will be losers — perhaps fiduciaries most immediately but plan participants, sadly, in the end.
I.
A.
It is, to repeat, doubtful that ERISA-plan fiduciaries should ever be held monetarily hable for objectively reasonable investment decisions. This follows from § 1109 of ERISA, which provides that fiduciaries that breach their duties of procedural prudence “shall be personally liable to make good to such plan any losses to the plan resulting from each such breach.” 29 U.S.C. § 1109(a) (emphasis added). In other words, monetary liability under § 1109 lies for a fiduciary’s breach of the duty of procedural prudence only where a plaintiff also establishes loss causation. Because investment outcomes are always uncertain, not every investment decision that leads to a diminution in plan assets counts as a loss for § 1109 purposes. Rather, loss causation only exists if the substantive decision was, all things considered, an objectively unreasonable one. If, by contrast, we might expect a hypothetical prudent investor to consider the decision prudent, the loss cannot be attributed to the actual fiduciaries.
This interpretation of § 1109’s text is well established. Then-Judge Scalia’s opinion in Fink v. National Savings & Trust Co., 772 F.2d 951 (D.C.Cir.1985), is the locus classicus for the need to prove substantive imprudence prior to the imposition of personal monetary liability under § 1109. In Fink, he observed that he knew of
no case in which a trustee who has happened — through prayer, astrology or just blind luck — to make (or hold) objectively prudent investments (e.g., an investment in a highly regarded “blue chip” stock) has been held liable for losses from those investments because of his failure to investigate and evaluate beforehand.
Id. at 962 (Scalia, J., concurring in part and dissenting in part). The majority misreads the Fink concurrence to require that a hypothetical prudent fiduciary make “the same decision.” Maj. Op. at 366. In so doing, the majority imputes its own erroneous interpretation of loss causation into Justice Scalia’s invocation of “objectively prudent investments.” Indeed, the example Justice Scalia gave — an investment in a highly regarded blue chip stock — demonstrates the obvious: just as there is more than one such blue chip stock, there is a *374 reasonable range of investments that qualify as objectively prudent.
Although there is an evidentiary relationship between the breach of a fiduciary’s duty of procedural prudence and loss causation, these two elements of fiduciary liability under ERISA are distinct: “It is the imprudent investment rather than the failure to investigate and evaluate that is the basis of suit; breach of the latter duty is merely evidence bearing upon breach of the former, tending to show that the trustee should have known more than he knew.” Fink, 772 F.2d at 962 (Scalia, J., concurring in part and dissenting in part).
The question posed by this case has in fact already been decided. This circuit has embraced Justice Scalia’s approach. In Plasterers’ Local Union No. 96 Pension Plan v. Pepper, 663 F.8d 210 (4th Cir.2011), we considered a suit for breach of fiduciary duty under ERISA against former plan fiduciaries. We noted that “simply finding a failure to investigate or diversify does not automatically equate to causation of loss and therefore liability.” 663 F.3d at 217. Rather, in order to hold fiduciaries “liable for damages based on their given breach of [their] fiduciary dut[ies]” described in 29 U.S.C. § 1104, a “court must first determine that the [fiduciaries’] investments were imprudent.” Id.; see also id. at 218 (quoting Justice Scalia’s opinion in Fink). The loss, in other words, must “result[] from” the breach, 29 U.S.C. § 1109(a), which it ean-not if the investment itself was a prudent one.[1]
Our sister circuits have also generally adopted Justice Sealia’s reasoning as to loss causation in Fink. See, e.g., Renfro v. Unisys Corp., 671 F.3d 314, 322 (3d Cir.2011) (approving of the objective-prudence test for fiduciary liability under ERISA); Kuper v. Iovenko, 66 F.3d 1447, 1459-60 (6th Cir.1995), abrogated on other grounds by Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. -, -, 134 S.Ct. 2459, 2466-67, 189 L.Ed. 457 (2014); Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 919 (8th Cir.1994) (“Even if a trustee failed to conduct an investigation before making a decision, he is insulated from liability if a hypothetical prudent fiduciary would have made the same decision anyway.”). To be sure, the insufficiently studious fiduciary may be (and quite possibly should be) relieved of his responsibilities. But for monetary liability to attach, it matters not whether the fiduciary spent a relatively longer or shorter time on a decision, so long as that investment decision was prudent in the end.
B.
The requirement of loss causation has three important corollaries. First, loss causation remains part of the plaintiffs burden in establishing monetary liability under ERISA. This is because, as I have noted above, loss causation is an element *375 of a claim under § 1109, which requires that the losses “result[ ] from” the breach of fiduciary duty. 29 U.S.C § 1109(a); see also Plasterers’, 668 F.3d at 217 (“[W]hile certain conduct may be a breach of an ERISA fiduciary’s duties under [29 U.S.C.] § 1104, that fiduciary can only be held liable upon a finding that the breach actually caused a loss to the plan.”).
Even if, as the district court found, the burden of production shifts to the defendant once the plaintiff makes a prima facie case for breach and loss, see Tatum v. R.J. Reynolds Tobacco Co., 926 F.Supp.2d 648, 683 (M.D.N.C.2013), the burden of proof (persuasion) must lie with the plaintiff, where, as here, Congress has not provided for burden shifting to the defendant. Leaving the burden of proof with the plaintiff is consistent with the Supreme Court’s recognition of the “ordinary default rule that plaintiffs bear the risk of failing to prove their claims,” including each required element. Schaffer ex rel. Schaffer v. Weast, 546 U.S. 49, 56, 126 S.Ct. 528, 163 L.Ed.2d 387 (2005). It also accords with this court’s observation that, “[w]hen a statute is silent, the burden of proof is normally allocated to the party initiating the proceeding and seeking relief.” Weast v. Schaffer ex rel. Schaffer, 377 F.3d 449, 452 (4th Cir.2004), aff'd, 546 U.S. 49, 126 S.Ct. 528, 163 L.Ed.2d 387.
The weight of circuit precedent supports keeping the burden of proof on the party bringing suit. See, e.g., Silverman v. Mut. Ben. Life Ins. Co., 138 F.3d 98, 105 (2d Cir.1998) (Jacobs, J., with Meskill, J., concurring) (“Causation of damages is ... an element of the [ERISA] claim, and the plaintiff bears the burden of proving it.”); Kuper, 66 F.3d at 1459 (“[A] plaintiff must show a causal link between the failure to investigate and the harm suffered by the plan.”); Willett v. Blue Cross & Blue Shield of Ala., 953 F.2d 1335, 1343 (11th Cir.1992) (noting that “the burden of proof on the issue of causation will rest on the beneficiaries” who must “establish that their claimed losses were proximately caused” by the fiduciary breach).
The cases cited by Tatum and the majority to justify shifting the burden of proof to RJR on loss causation are distinguishable.[2] Several deal with self-dealing, a far more serious breach of fiduciary duty than simple lack of prudence. See, e.g., McDonald v. Provident Indem. Life Ins. Co., 60 F.3d 234, 237 (5th Cir.1995); N.Y. State Teamsters Council v. Estate of De-Pemo, 18 F.3d 179, 182 (2d Cir.1994); Martin v. Feilen, 965 F.2d 660, 671-72 (8th Cir.1992). The majority’s reliance on our opinion in Brink v. DaLesio, 667 F.2d 420 (4th Cir.1982), is also unavailing, since that case not only dealt with self-dealing, but also concerned the burden of proof regarding the extent of liability, not the existence of loss causation. See 667 F.2d at 425-26. More relevant to this case is United States Life Insurance Co. v. Mechanics & Farmers Bank, 685 F.2d 887 (4th Cir.1982), in which we rejected
the novel proposition that, whenever a breach of the obligation by a trustee has been proved, the burden shifts to the trustee to establish that any loss suffered by the beneficiaries of the trust was not proximately due to the default of the trustee, and that, unless the trustee meets this burden, recovery against the trustee for the full loss follows in course.
685 F.2d at 896. Our precedent and the first principles of civil liability indicate *376 that, while the burden of production may shift as a case progresses, the burden of persuasion should remain with the plaintiff in a § 1109 action.
The second notable consequence of § 1109’s requirement of loss causation is a practical one: it is generally difficult to establish loss causation when a fiduciary’s substantive decision is objectively prudent. This is because objectively prudent decisions tend not to lead to losses to the plan. But even where they do, they are not the sort of losses contemplated by the § 1109 remedial scheme, since it is unreasonable to fault a prudent investment strategy for the statistical reality that even the best-laid investment plans often go awry. Because “[t]he entire statutory scheme of ERISA demonstrates that Congresses] overriding concern in enacting the law was to insure that the assets of benefit funds were protected for plan beneficiaries,” it follows that fiduciaries _ who “act imprudently, but not dishonestly, ... should not have to pay a monetary penalty for their imprudent judgment so long as it does not result in a loss to the [f]und.” Plasterers’, 663 F.3d at 217 (internal quotation marks omitted) (quoting Brock v. Robbins, 830 F.2d 640, 647 (7th Cir.1987)).
Thirdly, the loss-causation requirement shows how the majority has misconceived ERISA’s remedial scheme. Section 1109 sets out the appropriate remedies in those situations where a fiduciary’s breach of procedural prudence does not result in losses: “other equitable or remedial relief ..., including removal of such fiduciary.” 29 U.S.C. § 1109(a); see also Brock, 830 F.2d at 647 (“If [a plaintiff] can prove to a court that certain trustees have acted imprudently, even if there is no monetary loss as a result of the imprudence, then the interests of ERISA are furthered by entering appropriate injunctive relief such as removing the offending trustees from their positions.”); Fink, 772 F.2d at 962 (“Breach of the fiduciary duty to investigate and evaluate would sustain an action to enjoin or remove the trustee.... But it does not sustain an action for the damages arising from losing investments.”) (citation omitted). This provision for such relief as removal is in direct contrast to the monetary liability that ERISA imposes only upon a finding of loss causation. ERISA is a “comprehensive and reticulated statute,” Mertens v. Hewitt Assocs., 508 U.S. 248, 251, 113 S.Ct. 2063, 124 L.Ed.2d 161 (1993) (internal quotation marks omitted), and Congress crafted its provisions with care. Removing a fiduciary is one thing; holding that same fiduciary personally liable for a prudent investment decision is something else altogether. Where, as here, the statutory text speaks clearly to the proper use of monetary versus other, more traditionally equitable remedies, it should be followed, not flouted.
The majority gets this all wrong. It states that § 1109(a) “provides for both monetary and equitable relief, and does not (as the dissent claims) limit a fiduciary’s liability for breach of the duty of prudence to equitable relief.” Maj. Op. at 356 (emphasis in original). Of course it provides for both, but it provides for monetary liability only to make good losses to the plan resulting from the breach. And here the court found after a month-long trial that such losses did not result, because the investment decision was itself objectively prudent. It is astounding that ERISA fiduciaries are henceforth going to be held personally liable when losses did not “result from” any breach on their part. The majority decision quite simply reads the words “resulting from” right out of the statute.
C.
The majority, Tatum, and Tatum’s amici focus on supposed distinctions between *377 whether a hypothetical prudent fiduciary “would have” or merely “could have” made the same decision that the RJR fiduciaries did. They then fault the district court for using the latter standard. Tatum argues that the “could have” standard used by the district court will turn ERISA’s demanding fiduciary obligations into a “corporate business judgment rule,” since it “renders irrelevant the prudence or non-prudence of the fiduciaries’ actions in making those decisions.” Br. of Appellant at 36, 37. The Acting Secretary of Labor argues that a “could have” standard “creates too low a bar, allowing breaching fiduciaries to avoid financial liability based even on remote possibilities.” Br. of Acting Sec’y of Labor at 23.
The majority’s claim that the district court’s approach “encompass[es] even the most remote of possibilities,” Maj. Op. at 365, is a serious mischaracterization. As the district court observed, this is a “strained reading” of its view, which was simply that objective prudence does not dictate one and only one investment decision. Tatum, 926 F.Supp.2d at 683. ERISA requires that a fiduciary act “with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims.” 29 U.S.C. § 1104(a)(1)(B); see also 29 C.F.R. § 2550.404a-l(a). As a result, the district court’s standard would not be satisfied merely by imagining any single hypothetical fiduciary that might have come to the same decision. Rather, it asks whether hypothetical prudent fiduciaries consider the path chosen to have been a reasonable one. The Supreme Court recently came to a similar conclusion. The Court suggested that where a plaintiff alleges that ERISA plan fiduciaries should have utilized inside information in administering single-stock funds, courts “should also consider whether the complaint has plausibly alleged that a prudent fiduciary in the defendant’s position could not have concluded that” acting on the inside knowledge “would do more harm than good.” Fifth Third, — U.S. at -, 134 S.Ct. at 2473 (emphasis added).
That ERISA’s duty of prudence allows for the possibility that there may be several prudent investment decisions for any given scenario should not be a surprise. Investing is as much art as science, in which there are many options with uncertain outcomes, any number of which may be prudent. Tatum’s own experts conceded at trial that prudent minds may disagree, indeed diametrically, over the preferable course of action in a particular situation. Tatum, 926 F.Supp.2d at 683 n. 27, 690. Thus, a decision may be objectively prudent even if it is not the one that plaintiff, armed with all the advantages of hindsight, now thinks is optimal. Optimality is an impossible standard. No investor invariably makes the optimal decision, assuming we know what that decision even is.
Ultimately, the majority’s and Tatum’s minute parsings of the differences between “would have” and “could have” obfuscate rather than illuminate. It is semantics at its worst. The same is true of their definition of a reasonable investment decision as the one that hypothetical prudent fiduciaries would “more likely than not” have come to. This provides no legal basis on which to reverse the district court’s simple finding, after a month-long bench trial, that defendants made an objectively prudent investment decision here.
What might plaintiffs’ new semantics mean? Reading the plaintiffs’ “would have” standard to permit fiduciaries to escape monetary liability only if they make *378 the decision that the majority of hypothetical prudent fiduciaries would “more likely than not” have made is all too treacherous. Not only does the “more likely than not” language insistently urged by the majority, plaintiff, and his various amici find no support in statute or regulation. Not only is it a transparent gloss upon the Act. It seeks to shift the standard of objective prudence to one of relative prudence: whether prudent fiduciaries would “more likely than not” have come to “the same [investment] decision” that defendants did. Maj. Op. at 364; Br. of Appellant at 7; see also Br. of Acting Sec’y of Labor at 23; Br. of AARP & Nat’l Emp’t Lawyers Ass’n at 14. The majority orders the district court on remand to divine whether “a fiduciary who conducted a proper investigation would have reached the same decision.” Maj. Op. at 369 (emphasis added). The only possible effect of such language is to squeeze and constrict and, once again, to ignore the fact that there is not one and only one “same decision” that qualifies as objectively prudent.
Thus plaintiff would substitute for the fiduciary’s duty to make a prudent decision a duty to make the best possible decision, something ERISA has never required. Take a scenario in which 51% of hypothetical prudent fiduciaries would act one way and 49% would act the other way. What sense, let alone justice, is there in penalizing a fiduciary merely for acting in accordance with a view that happens to be held by a bare minority? And how, absent an unhealthy dose of hindsight, could we ever know the precise breakdown of hypothetical fiduciaries with regard to a particular investment decision? See Br. of Chamber of Commerce of U.S. of Am. & Am. Benefits Council at 15-16.
While the majority protests it has not adopted the most prudent standard, its actions speak louder than words. It has reversed a “merely” prudent, eminently sensible decision, and demanded much more. Moreover, all its fuss over “would have/could have” carries us far from the general standard of objective prudence-embodied in § 1104(a)(1)(B). That is, of course, the straightforward test that Plasterers’ articulated when it remanded back to the district court to “determine the prudence of the [fiduciaries’] actual investments.” 663 F.3d at 219. The majority complains that the dissent fails “to define” the objective prudence standard or to say precisely “how this standard would operate in practice.” Maj. Op. at 369. But the trial here showed exactly how that standard operates in practice. Prudence depends inescapably upon the particular circumstances confronting fiduciaries; it is a fool’s errand to attempt to sketch every situation that might arise. Even without the majority’s linguistic contortions, the law of fiduciary obligations under ERISA is complex enough. The layer of scholasticism the majority adds to what should be a straightforward factual inquiry into objective prudence helps no one. One can, of course, play the endless permutations of the “would have”/“could have” game. But the test is one of objective prudence sim-pliciter, taking the circumstances as they existed at the time.
To make matters worse, the majority all but directs a finding of personal liability on remand. In affirming the district court’s finding that RJR was procedurally imprudent, the majority falls over itself in its rush to defer to the district court’s “extensive factual findings.” Id. at 22. Fair enough: I have no quarrel with the trial court’s “extensive factual findings” that the RJR fiduciaries acted in a procedurally imprudent fashion. Yet when it comes to substantive prudence, the majority slams the door on the district court’s “extensive factual findings” when the majority even so much as deigns to discuss them. More *379 over, the majority minimizes risk as a factor, stressing instead “the timing of the decision and the requirements of the governing Plan document,” id. at 45, despite ERISA’s express command that fiduciaries “diversify ] the investments of the plan so as to minimize the risk of large losses, unless under the circumstances it is clearly prudent not to do so.” 29 U.S.C. § 1104(a)(1)(C) (emphasis added). Further, the majority ignores the Supreme Court’s statement that § 1104 “makes clear that the duty of prudence trumps the instructions of a plan document.” Fifth Third, — U.S. at -, 134 S.Ct. at 2468. According to the majority, “plan documents [are] highly relevant” to the objective prudence inquiry, Maj. Op. at 367, but risk is merely “relevant,” id. at 43. It is difficult to see how fiduciaries can survive this loaded calculus, one in which procedural imprudence all but ensures the obliteration of the loss causation requirement.[3]
D.
There is one final point. The majority tries to justify what it is doing with the thought that its approach is necessary to deter fiduciaries from imprudent behavior. But that in no way justifies overriding the statute — in particular § 1109, which establishes a requirement of loss causation, and § 1104, which establishes a standard of prudence under all the circumstances. This is a rewriting of the statute, and, frankly, Congress’s wisdom is a lot more persuasive than the majority’s.
Under the statute as written, the standard used by the district court deters fiduciaries from procedural imprudence by the threat of removal and from substantive imprudence by the knowledge that resulting losses to the fund will in fact lead to liability. As we said in Plasterers’, quoting the Seventh Circuit:
The only possible statutory purpose for imposing a monetary penalty for imprudent but harmless conduct would be to deter other similar imprudent conduct. However, honest but potentially imprudent trustees are adequately deterred from engaging in imprudent conduct by the knowledge that imprudent conduct will usually result in a loss to the fund, a loss for which they will be monetarily penalized. This monetary sanction adequately deters honest but potentially imprudent trustees. Any additional deterrent value created by the imposition of a monetary penalty is marginal at best. No ERISA provision justifies the imposition of such a penalty.
663 F.3d at 217-18 (internal quotation marks omitted) (quoting Brock, 830 F.2d at 640).
II.
Even if one thinks that monetary liability should somehow attach to prudent investment decisions, it should almost never lie where the decision was made, as this one was, in the interest of diversifying plan assets. The importance of diversification in retirement plans is reflected in ERISA’s text, which explicitly requires plan fiducia *380 ries to “diversify[ ] the investment of the plan so as to minimize the risk of large losses, unless under the circumstances it is dearly prudent not to do so.” 29 U.S.C. § 1104(a)(1)(C) (emphasis added).
“Diversification is fundamental to the management of risk and is therefore a pervasive consideration in prudent investment management.” Restatement (Third) of Trusts § 227 cmt. f (1992). Diversification’s ability to reduce risk while preserving returns is a major focus of modern portfolio theory, which has been adopted both by the investment community and by the Department of Labor in its implementing regulations for ERISA. See DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 423 (4th Cir.2007) (citing 29 G.F.R. § 2550.404a-l). Diversification is even more important in the context of retirement savings, where the avoidance of downside risk is of paramount concern. “A trustee is not an entrepreneur.... He is supposed to be careful rather than bold.” Armstrong v. LaSalle Bank Nat’l Ass’n, 446 F.3d 728, 733 (7th Cir.2006).
Although ERISA does not in so many words require every fund in an investment plan to be fully diversified, each fund, when considered individually, must be prudent. See DiFelice, 497 F.3d at 423. This is because 401(k) participants could easily view the inclusion of a fund as an endorsement of it by the plan fiduciaries and invest a sizeable portion or even the entirety of their assets in a high-risk fund. The RJR fiduciaries were concerned about this very possibility when they decided to maintain a prohibition on making new investments into the Nabisco funds. See Tatum v. R.J. Reynolds Tobacco Co., 926 F.Supp.2d 648, 661-62 (M.D.N.C.2013).
In addition, once plan participants allocate their assets among various funds, there is a substantial risk that inertia will keep them from carefully monitoring and reallocating their retirement savings to take into account changing risks. Indeed, a witness for RJR testified at trial that over 40% of plan participants who had invested in the Nabisco funds did not make a single voluntary plan transfer over a five-and-a-half-year period from 1997 to 2002. See J.A. 846-48. Because the RJR plan already contained an employer-only single-stock fund, maintaining the Nabisco funds would multiply the number of risky, single-stock funds in which RJR plan participants could invest. See Tatum, 926 F.Supp.2d at 685.
The requirement that management of retirement plans be prudent rather than aggressive strongly supports diversifying each fund. As the district court recognized, a “single stock fund carries significantly more risk than a diversified fund.” Id. at 684; see also Summers v. State St. Bank & Trust Co., 453 F.3d 404, 409 (7th Cir.2006). For this reason, single-stock funds are generally disfavored as ERISA investment vehicles. See, e.g., DiFelice, 497 F.3d at 424 (noting that “placing retirement funds in any single-stock fund carries significant risk, and so would seem generally imprudent for ERISA purposes”). To be sure, Congress has provided a limited exception from ERISA’s general diversification requirements for certain types of employer-only single-stock funds. See 29 U.S.C. §§ 1104(a)(2), 1107(d)(3). Still, single-stock funds inherently “are not prudently diversified.” Fifth Third Bancorp v. Dudenhoejfer, 573 U.S. -, -, 134 S.Ct. 2459, 2465, 189 L.Ed. 457 (2014) (emphasis in original). And absent this narrow congressional carve-out for employer-only single-stock funds, “[tjhere is a sense in which, because of risk aversion, [a single-stock fund] is imprudent per se.” Armstrong, 446 F.3d at 732.
*381 In this case, the Nabisco funds were even more dangerous than an ordinary single-stock fund. Because of the “tobacco taint” and the risk that a massive tobacco-litigation judgment against RJR could also harm Nabisco, the performance of the Nabisco funds was potentially correlated with that of RJR itself. Thus, retirement plans containing the Nabisco funds were doubly undiversified. First, they included the stocks of a single company rather than a range of companies. Second, the same external forces that could harm RJR — and thus imperil the employment of plan participants — could simultaneously tank the value of the Nabisco funds. See Tatum, 926 F.Supp.2d at 685. In other words, keeping the Nabisco funds in the RJR plan would create the risks of an Enron-like situation, in which the health of an employer and the retirement savings of its employees could be adversely affected simultaneously. See Richard A. Oppel Jr., Employees’ Retirement Plan Is a Victim as Enron Tumbles, N.Y. Times, Nov. 22, 2001, at Al. But unlike the employer single-stock funds that might have legislative sanction, no such congressional approval existed for the Nabisco funds.
By penalizing the RJR fiduciaries for doing nothing more than properly diversifying the plan, the majority and Tatum threaten to whipsaw investment managers of pension and retirement funds. The majority’s approach falls into the trap of seeing plan fiduciaries and participants as inveterate adversaries. In fact, nothing could be further from the truth. Fiduciaries often act to the inestimable benefit of plan participants, and they do so most clearly when they follow ERISA’s mandate to diversify plan holdings. But the majority’s approach will wreak havoc upon this harmony, encouraging opportunistic litigation to challenge even the most sensible financial decisions. Here, the RJR fiduciaries knew they had a ticking time bomb on their hands. Had the plan fiduciaries failed to diversify and the Nabisco stocks had continued to decline, the fiduciaries would have been sued for keeping the stocks. As the Supreme Court noted:
[I]n many cases an ESOP fiduciary who fears that continuing to invest in company stock may be imprudent finds himself between a rock and a hard place: If he keeps investing and the stock goes down he may be sued for acting imprudently in violation of § 1104(a)(1)(B), but if he stops investing and the stock goes up he may be sued for disobeying the plan documents in violation of § 1104(a)(1)(D).
Fifth Third, — U.S. at -, 134 S.Ct. at 2470 Putting plan managers in a cursed-if-you-do, cursed-if-you-don’t situation is unfair to them and damaging to ERISA-plan administration generally.
III.
Even if prudent decisions made in the interest of asset diversification could ever lead to monetary liability, it is inconceivable that they could do so on these facts. As the district court well understood, if monetary liability lies here, then it will lie for a great many other prudent choices as well.
“[Wjhether a fiduciary’s actions are prudent cannot be measured in hindsight....” DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 424 (4th Cir.2007). This is because “the prudent person standard is not concerned with results; rather it is a test of how the fiduciary acted viewed from the perspective of the time of the challenged decision rather than from the vantage point of hindsight.” Roth v. Sawyer-Cleator Lumber Co., 16 F.3d 915, 918 (8th Cir.1994) (alteration and internal quotation marks omitted). “Because the content of the duty of prudence turns on ‘the circum *382 stances ... prevailing’ at the time the fiduciary acts, § 1104(a)(1)(B), the appropriate inquiry will necessarily be context specific.” Fifth Third Bancorp v. Dudenhoeffer, 573 U.S. -, -, 134 S.Ct. 2459, 2471, 189 L.Ed. 457 (2014) (alteration in original).
In addition to the diversification imperatives described above, there were at least three reasons for the RJR fiduciaries to eliminate, at the time they had to make the decision, the Nabisco stocks from the RJR 401(k) plan. First, as found by the district court, there was a substantial threat to the Nabisco stocks’ share prices from the “tobacco taint.” Tatum v. R.J. Reynolds Tobacco Co., 926 F.Supp.2d 648, 659-60 (M.D.N.C.2013). Although Nabisco had theoretically insulated itself from liability for RJR’s tobacco-related litigation by entering into indemnification agreements with RJR, there was always a danger that holders of judgments against RJR might sue Nabisco for any amount that RJR could not pay. This danger became especially acute after a Florida jury ruled in July 1999 against RJR in a class-action lawsuit. Id. at 659. As the damages portion of the trial began in the fall of 1999, RJR began to worry that it would not be able to fully pay a multibillion dollar award and that members of the class would sue Nabisco for the unpaid remainder. Id. at 660. In a June 1999 report to the SEC, Nabisco acknowledged these very risks. Id. at 659. And when RJR lost an important punitive-damages ruling in the Florida suit, the stock prices of RJR and Nabisco both dropped sharply. Id. at 660. Indeed, the Florida jury ultimately awarded the class over $140 billion in punitive damages. Id. at 660 n. 9. (Related litigation is ongoing. On July 18, 2014, a Florida jury awarded $23.6 billion in punitive damages against RJR in an individual case stemming from that class action.)
Second, Nabisco’s stock prices had been steadily falling since the two companies split. Between June 15, 1999, when the split was finalized, and January 31, 2000, when RJR sold the two Nabisco stocks in its 401(k) plan, their prices had fallen substantially in value, one by 60% and the other by 28%. Id. at 666. Cautious fiduciaries would naturally view optimistic glosses on Nabisco’s continuing stock decline with skepticism. Not only were analyst reports during the dot-com bubble colored by “optimism bias,” but even the neutral and positive reports noted the effect of the tobacco taint and that the current share price might well be accurate. Id. at 662-63. And even had RJR chosen to keep the Nabisco stocks, there was, as the district court noted, no reason to think that the stocks would have provided above-market returns, given the public nature of the relevant financial information and the general efficiency of the stock market. Id. at 686-88. As the Supreme Court has recognized, “a fiduciary usually ‘is not imprudent to assume that a major stock market ... provides the best estimate of the value of the stocks traded on it that is available to him.’ ” Fifth Third, — U.S. at -, 134 S.Ct. at 2471 (quoting Summers v. State Street Bank & Trust Co., 453 F.3d 404, 408 (7th Cir.2006)) (alteration in original).
Third, the ultimate cause of the dramatic appreciation in Nabisco stock prices in 2000 — the bidding war sparked by investor Carl Icahn’s takeover bid — was totally unexpected by RJR, analysts, and the broader market. Notably, when Icahn acquired a large block of Nabisco shares in November 1999, Nabisco’s stock prices did not react and analyst reports did not mention a possible takeover bid. Tatum, 926 F.Supp.2d at 688. In addition, the RJR-Nabisco split was structured such that the spinoff would be tax-free as long as, broadly speaking, Nabisco did not initiate a cor *383 porate restructuring within two years. Id. at 653. Thus, a takeover by Icahn was only feasible if he initiated it. This limitation made an Icahn offer, and the consequent bidding war, even less likely. Id. at 688-89.
Ultimately, the RJR fiduciaries had little reason to think that the Nabisco stocks in the 401(k) plan would appreciate in value, and every reason to worry that they would continue to decline. The fiduciaries’ decision to liquidate the Nabisco funds was prudent, and certainly not “clearly imprudent.” Plasterers’ Local Union No. 96 Pension Plan v. Pepper, 663 F.3d 210, 219 (4th Cir.2011). Arguably, it was the most prudent of the options available, for it protected plan participants from the dangers of risky shares held in undiversified plan funds. To hold otherwise requires viewing the RJR fiduciaries’ actions through the lens of hindsight, a grossly unfair practice that our precedent categorically forbids.
IV.
The majority has reversed the most substantiated of district court findings under the most stringent of hindsight tests. To impose personal monetary liability upon fiduciaries for prudent investment decisions made in the interest of asset diversification makes no sense. What this decision will lead to, despite all the words from the majority and Tatum, is litigation at every stage behind reasonable investment decisions by ERISA-plan fiduciaries. Who would want to serve as a fiduciary given this kind of sniping?
ERISA was “intended to ‘promote the interests of employees and their beneficiaries in employee benefit plans.’ ” DiFelice v. U.S. Airways, Inc., 497 F.3d 410, 417 (4th Cir.2007) (quoting Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 90, 103 S.Ct. 2890, 77 L.Ed.2d 490 (1983)). Yet far from safeguarding the assets of ERISA-plan participants, the litigation spawned by the majority will simply drive up plan-administration and insurance costs. It will discourage plan fiduciaries from fully diversifying plan assets. It will contribute to a climate of second-guessing prudent decisions at the point of market shift. It will disserve those whom ERISA was intended to serve when fiduciaries are hauled into court for seeking, sensibly, to safeguard retirement savings.
I had always entertained the quaint thought that law penalized people for doing the wrong thing. Now the majority proposes to penalize those whom the district court found after a month-long trial did indisputably the right thing — in professional parlance, the objectively prudent thing.
I would affirm.

. The majority claims that "in Plasterers’, we turned to the standard set forth by our sister circuits. Thus, we explained that a decision is 'objectively prudent' if 'a hypothetical prudent fiduciary would have made the same decision anyway.' ” Maj. Op. at 363 (quoting Plasterers', 663 F.3d at 218). Nothing could be more in error. Nothing — no combination of phrases, words, or syllables' — in Plasterers’ amounts to an adoption of a "would have" standard. The quotation the majority treats as a holding was used merely to demonstrate that "causation of loss is not an axiomatic conclusion that flows from a breach” of a procedural duty. 663 F.3d at 218. In actuality, the holding of the court was that fiduciaries "can only be held liable for losses to the Plan actually resulting from their failure to investigate.” Id. The brief snippet the majority quotes from appellants’ brief in Plasterers’, Maj. Op. at 364 n. 12, only fortifies the central point: "Would have” versus "could have” was not discussed, was not briefed, and was not before the court.

. For clarity, this opinion also refers to the various other RJR-related entities, such as R J. Reynolds Tobacco Holdings, Inc., and the RJR Pension Investment and Employee Benefits Committees, simply as RJR.

. The majority contends that "[u]nder the dissent's reading of the statute, any decision assertedly 'made in the interest of diversifying plan assets' would be automatically deemed 'objectively prudent.’ " Maj. Op. at 370. That statement is patently incorrect, for if there were any per se rule of the sort that the majority suggests, there would have been no need for the district court to conduct an extended trial considering all the circumstances, including the timing of the decision and the governing plan document, that bore on the investment judgment. In point of fact, it is the majority that minimizes the importance of asset diversification as one of the factors bearing upon the objective prudence inquiry despite ERISA’s clear instruction to the contrary.